CHARLES H. MOORE, as Receiver, etc., Appellant, *v.* THE
AMERICAN LOAN AND TRUST COMPANY, Impleaded, etc.,
Respondent.

W., one of several co-executors, describing himself as executor, applied to
defendant for a loan, offering as security certain stock belonging to the
estate; this was refused unless the co-executors joined in the transaction.
The suggestion was then made by or in the presence of one of defendant's
officers that if the stock was transferred to one of the legatees the loan
could be made; it was transferred to S., a legatee, who paid no con-
sideration therefor, and, with knowledge of defendant's president of the
object of such transfer, it discounted a joint and several note, executed by
the legatee and W., as "managing executor," the stock being pledged as col-
lateral, it being described in the note as the property of S., and defendant
agreed to account to her for any surplus arising on the sale. Defendant gave
its check for the sum loaned payable to the order of S.; she gave her indi-
vidual receipt therefor, and the transaction was entered on defendant's book
as a loan to S. Before the transaction W. had executed an assignment in
blank of the stock certificate; at the time thereof he filled in the blank
with the name of defendant's president as "trustee." W., after the
transaction, absconded. In an action to recover for the estate the stock
so pledged, *held*, that a finding that the loan was made to W., as executor,
or that the money advanced ever became assets in his hands was not
justified by the evidence; that it clearly showed a contrivance partici-
pated in by W., S. and defendant to waste the assets of the estate, in
pursuance of which the loan was made to S., secured by pledge of the
stock, which, although described as the property of S., were, to the
knowledge of defendant, the property of the estate, and was pledged
to secure credit for S.; that the fact defendant was told that "the
money was going to the benefit of the estate" was not material; that the
transfer was an abuse of trust on the part of the executor, and that plaintiff
was entitled to an unconditional return of the security, or to a return
upon paying such portion of the loan as it shall appear was received by
W. and applied by him upon the debts of the estate, and that the burden
of showing this was upon defendant.
The check given by defendant was indorsed by S., the payee, in blank. It
was also indorsed by W., who was president of the F. N. Bank of Albion,
as president, payable to the cashier of the T. N. Bank of New York
"for collection or order," and was charged on the books of the F. N. Bank
against the New York Bank. The defendant claimed that the check was
delivered to and deposited by W. in the F. N. Bank and the money
applied for the benefit of the estate. Plaintiff offered to prove that it

was deposited to the credit of S. in the F. N. Bank, and was drawn out upon her checks. This was objected to and excluded. *Held*, error.

The general rule of the common law, which relieves a purchaser from an executor of any concern as to the disposition of the purchase-money by the executor, applies only where the purchaser in making the purchase relied upon the official character of the executor.

Neither that rule nor the statute (1 R. S. 730, § 66), relieving one who pays money in good faith to a trustee, which the latter is authorized to receive, from any responsibility as to its application, will protect a purchaser or a mortgagee who is a party to a breach of trust on the part of an executor, or has knowledge that the transaction was not within the usual course of administration, nor may he rely simply upon the representations of the executor; he can escape liability only by ascertaining that there are debts or obligations of the estate, and seeing to it that the money is paid thereon.

(Argued April 26, 1889; decided June 4, 1889.)

APPEAL from judgment of the General Term of the Supreme Court in the fifth judicial department, entered upon an order made the first Tuesday of June, 1887, which affirmed a judgment in favor of defendant, The American Loan and Trust Company, entered upon a decision of the court on trial at Special Term.

The nature of the action and the material facts are stated in the opinion.

*John Cunneen* for appellant.  The judge erred in excluding evidence that the money received from the trust company was deposited to the credit of the defendant Mary Burrows Smith in the First National Bank of Albion, and drawn out upon her checks, for if the loan was made by the defendant trust company to Mary B. Smith, and to secure the payment of this loan the stock was pledged, its use for that purpose was clearly illegal and transferred no right therein to the trust company. (*Smith* v. *Ayer*, 101 U. S. 320 : *Magwood* v. *Railroad Bank*, 5 S. C. 379 ; *Loring* v. *Salisbury Mills*, 125 Mass. 138 ; *La Baron* v. *L. I. Bank*, 53 How. 286 ; *Colt* v. *Lasnier*, 9 Cow. 342 ; *Lawrence* v. *Townsend*, 88 N. Y. 24 ; *Prall* v. *Hamil*, 28 N. J. Eq. 66 ; Jones on Pledges, § 485.)  Any person receiving from an executor the assets of

his testator, knowing that such disposition of them is in violation of his duty, is to be adjudged as conniving with the executor, and such person is responsible for the property thus received, either as a purchaser or a pledgee. (*Colt* y. *Lasnier*, 9 Cow. 342.) Executors have not the capacity when they borrow money to pledge assets as security for its repayment. (*Austin* v. *Monro*, 47 N. Y. 366; *Ferrin* v. *Myrick*, 41 id. 322; *Barry* v. *Lambert*, 98 id. 308, 309; *Schmittler* v. *Simon*, 101 id. 554; *McMann* v. *Allen*, 4 E. D. Smith, 519, 599; *Steadman* v. *Fiedler*, 20 N. Y. 437; 8 Abb. N. C. 90; Bouvier's Law Dict.; *Cousland* v. *Davis*, 4 Bosw. 619; *Felt* v. *Heye*, 23 How. 359; *Beecher* v. *Ackerman*, 1 Abb. Pr. [N. S.] 141.) It does not follow by analogy that because executors have power to sell the assets they may pledge them. (Jones on Pledges, 1; Bouvier's Dic., tit., Mtg. and Pledge; *Bloomer* v. *Waldron*, 3 Hill, 367.) It cannot be claimed by the respondent that this loan was made, or that these certificates were pledged in the exercise of the power given by the will to transact business in reference to the estate, and make and change investments and securities, these being trust powers and involving the exercise of discretion. (*Berger* v. *Duff*, 4 Johns. Ch. 368; *Gilman* v. *Gilman*, 4 Hun, 68; *Thatcher* v. *Candee*, 3 Keyes, 160.) The defendant was bound to know that the debtor could not legally use the assets of the estate to borrow money to pay a debt for which such assets were not chargeable, and having this knowlege they cannot appropriate the stocks to their own use. (*Austin* v. *Monro*, 47 N. Y. 366; *Ferrin*, v. *Myrick*, 41 id. 322; *Barry* v. *Lambert*, 98 id. 308, 309; *Schmittler* v. *Simon*, 101 id. 554.)

*B. F. Blair* for respondent. When Warner, with Signor's and Mrs. Smith's assistance, secured the loan and received our check, he received it as executor. What he did with it, or with its proceeds, thereafter, did not concern defendant. It was not bound either to inquire into the *bona fides* of the debt he mentioned or to see to the application of the money. (Williams on Executors, 935; Colebrooke on Collateral Secu-

rities, 301; Perry on Trusts, 809; Jones on Pledges, 489; Dayton on Surrogates, 307, 308; *Leitch* v. *Wells*, 48 N. Y. 485; *Lowry* v. *C. and F. Bank*, Taney's C. C. 310.) A pledge or other disposition by an executor will be upheld where the purpose was, or was honestly believed by the grantee or pledgee to be, a legitimate purpose of administration. (*Carter* v. *Nat. Bank of Lewiston*, 71 Me. 448; 20 id. 21; *Pettengill* v. *Pettengill*, 60 id. 412, 425; Colebrooke on Collateral Securities, § 301; *Field* v. *Schiefflin*, 7 Johns. Ch. 154; Boone's Law of Mortgages, § 321; 3 Redf. on Wills, chap. 8, § 32, pt. 4; Perry on Trusts, § 809; *Lowry* v. *C. and F. Bank*, Taney's C. C. 310, 330; *Wood's Appeal*, 92 Pa. St. 379; Jones on Pledges, §§ 61, 481, 482, 483; *Chamberlain* v. *L. Nat. Bank*, 2 Cent. Rep. 739.)

DANFORTH, J. The action is in equity to reclaim from the defendant the American Loan and Trust Company, for the estate of Roswell S. Burrows two hundred shares of the capital stock of the Niagara Falls International Bridge Company. The Special Term dismissed the complaint as against that defendant. During the life of Burrows the stock was his property and registered as such on the books of the company. He died on the 30th day of March, 1879, leaving a will by which he appointed five persons his executors. Four qualified as such, and, among others, Albert S. Warner. One died, two appointed Warner to act in their place, themselves taking no active part, and he at the time of the transaction in question was styled and was practically the managing executor. Under date of March 14, 1884, he executed a formal assignment in blank of three hundred shares, including those now in question. One hundred shares were subsequently returned to him, and shortly after, being ordered by the surrogate of Orleans county to render his account, he failed to do so and absconded from the State. He was then removed from the office of executor, and September 4, 1884, the plaintiff was appointed by the Supreme Court receiver of the estate of Burrows, and by its direction he brought this action.

I shall assume that, although Warner was only one of several executors, he could, by his single act and without concert with the others, effectually bind or dispose of the assets of the estate for any lawful purpose. Describing himself as "managing executor of the estate of R. S. Burrows," he executed by that name the blank transfer to which I have referred, and on the fifteenth of March inserted in the blank the name of R. N. Hazard, trustee, as upon an absolute sale for value received, with an authority in blank "to execute all necessary acts of assignment and transfer thereof." Hazard was the defendant's president. The plaintiff alleged in his complaint the possession by the defendant of the certificates of these shares under a claim to hold them as a pawn or pledge made by Warner and defendant Mary Burrows Smith, or one of them, as security for the payment of a note made by her; that the defendant claims that Warner transferred the stock to Mrs. Smith and she to them for that purpose, whereas the plaintiff alleges that if such transfer was made to Smith it was void, and if made to defendant by either it was collusive to enable Warner, in violation of his trust, to pervert the stock and its certificates from their lawful purposes.

The defendant's answer is verified by Hazard, its president, and "denies that Mary Burrows Smith has not and never has had any title to any of the shares of stock, or right to the possession of the certificates, but admits that it, the defendant, is now in possession of the certificates for the stock, and that it claims to hold them by virtue of a pawn or pledge and transfer to it, made by said Albert S. Warner and the defendant Mary Burrows Smith, or one of them, as collateral security for a note made by her, but it avers that the note was also signed by Warner, as executor of Roswell S. Burrows, deceased, and it claims that there is due and unpaid upon said note the sum of $14,000 and interest." The consideration of this note was a vital question upon the trial, and whether the loan it represented was made to Warner or to Mrs. Smith. Concerning it the trial judge found "that the loan for which the said three hundred shares of stock were so

pledged was made by the defendant, The American Loan and Trust Company, to the said Albert S. Warner, as executor, etc., of R. S. Burrows, deceased, and not to the defendant Mary Burrows Smith."

The facts that bear upon it are not in controversy, nor do they rest upon evidence as to which there is conflict. The question, therefore, is one of law. I am unable to find any testimony which sustains the finding. The undisputed evidence is, that before March fifteenth, Warner, describing himself executor, applied to the defendant for a loan of $25,000, offering as security the stock already mentioned with that of another corporation. The application was rejected because of Warner's inability, as he said, to procure the consent of his co-executors, and the defendant refused to make the loan without it, although urged to do so upon more than one occasion, and advised that Warner alone could bind the estate; the officers of the company refused to loan to him unless the co-executors joined in the transaction. That application was abandoned. Mr. Signor (a lawyer) was then called upon by Warner, Warner stating that he had authority for him to act for Mrs. Smith. She was a relative of Burrows. Signor went with Warner to defendant's office on March fifteenth; found its officers; found they were resolute in their position not to loan to Warner without the joint action of the executors, and then he and Mr. Snow, one of the defendant's officers, discusssed the matter, and one or the other said, " If the securities were transferred to one of the members of the family, and they should make the loan, that it could be made in that way." But it was finally required that he should state in writing what was proposed, and a paper was prepared. It was not produced in evidence, but, as the witness remembers, it "stated that Mary Burrows Smith, enumerated one of the legatees of Roswell S. Burrows, proposed to borrow of the loan and trust company $25,000 on certain securities, naming them and giving the par value of them, which I do not remember now; also giving about what the market value was; I remember it was stated they were not listed securities, but

giving what the actual value was and what dividend they paid, which I do not remember."

On the cross-examination of this witness by defendant's counsel, it was made to appear that "the matter of the transfer of the securities on which it was proposed to procure a loan to Mrs. Smith was spoken of between Warner and the witness before he went to the trust company, and that Warner then had the note which was given." Warner "wanted" the witness "to help satisfy the company that they could make the loan to him, and if he could not do that he was going to assign the stock to Mrs. Smith and make the loan to her;" and his recollection was that Warner handed to " him (the witness), as Mrs. Smith's attorney, the power of attorney and the certificates of stock, and he, the witness, handed them to Mr. Snow, the officer of the company." Mr. Snow, the secretary of the defendant, testified that on this occasion (March fifteenth) Warner told him he had come to get the loan, and had "transferred the securities to Mrs. Burrows Smith."

It also appears that after the appointment of the receiver, and the disappearance of Warner, parties interested in the estate, and curious to know the condition of this stock, went to the office of the defendant and were informed by its president, or by its attorney in his presence, "that the stock was transferred to Mary Burrows Smith for the purpose of making a loan, and she gave her note, and this stock was put up as collateral, and that they had the stock; showed us the stock or certificates of the stock of The Niagara Falls International Bridge Company."

On that occasion the president informed them "that Mr. Warner applied to them for a loan to take up another loan that he had made in settling a claim against the estate growing out of the Atlantic Bank failure, and that ·they declined to loan in that shape because they did not wish to loan to an executor. And this gentleman said that it was suggested, I think he used the phrase, "that he suggested to Mr. Warner," that he had said that it was on this bridge stock that they wanted to make the loan; and he said that he

suggested to Mr. Warner that. if the stock could be transferred to some member of the family that it would obviate that objection. And then it was transferred to Mrs. Mary Burrows Smith, and that they loaned on her note $25,000."

There is no dispute or contradiction of this testimony. It covers the negotiation which preceded the loan, and it contains the understanding of the defendant's officers, as they explained the matter after it became the subject of inquiry. But the papers written or signed, or delivered at the time, disclose what the transaction was, as there recorded, and are most satisfactory and conclusive evidence. The note, omitting only such portions as relate to the rights of the company in case of depreciation of the security, is as follows:

" $25,000.                    "NEW YORK, *March*     , 1884.

" On demand, for value received, we, Mary Burrows Smith and Albert S. Warner, as Executor, etc., of Roswell S. Burrows, dec'd, jointly and severally promise to pay to American Loan and Trust Company of New York, or order, at the Banking House of said Company, in funds current at N. Y. Clearing House, twenty-five thousand ($25,000) dollars, with a sum equal to six per cent. interest for the time said money remains unpaid as an agreed compensation for making such advance, having pledged to said Company as collateral security three hundred shares, the property of said Mary Burrows Smith, of the stock of the Niagara Falls International Bridge Company, cfts. No. 15 for 30 shares, No. 20 for 20 shares, Nos. 14, 65, 67, 68 and 69 for 50 shares each, total 300,     with authority to said company to sell the same without notice, on non-performance of this promise, in such manner as said Company, or its President, or Secretary or Treasurer, may deem proper, either at the Broker's Board or at public or private sale, applying the net proceeds to the payment of this note, including the above compensation, and accounting to her for the surplus, if any. In case of deficiency we promise to pay to said Trust Company forthwith, after such sale, the amount remaining due hereon.

    *     *     *     *     *     *

" And it is hereby agreed and understood that any excess
of security upon this note shall be applicable to any other
note or claim held at the time of default by said Company
against us, or either of us.

" MARY BURROWS SMITH.

" ALBERT S. WARNER,

" *Managing Executor of Estate of R. S. Burrows, Dec'd.*"

The day of the month does not appear in the note, but its
delivery was on the fifteenth of March, and concurrently the
defendant made its check upon the National Park Bank,
directing it to pay to the order of Mary Burrows Smith
$25,000. This check bears the indorsement, " Mary Burrows
Smith, by Isaac S. Signor, her attorney," and the testimony
is that this was the check issued on that loan, and that the
indorsement was made by Mr. Signor, as the attorney for
Mrs. Smith, and in due time the trust company received
from Mrs. Smith a receipt in these words :

" ALBION, N. Y., *March* 19, 1884.

" W. D. SNOW, Esq.,

*Sec'ry American Loan and Trust Co., New York City :*

" DEAR SIR. — I hereby acknowledge receipt of the pro-
ceeds of loan                for $25,000.00 on 300 shares
Niagara Falls International Bridge Company stock, and I
hereby ratify the indorsement made by I. S. Signor, attorney
for me, upon the check issued by your company for the
amount loaned.

" Respectfully yours,

" MARY BURROWS SMITH."

The whole transaction is also written upon the books of the
defendant where the loan is entered as follows :

" 1884, March 15th," and underneath the head of " loan,"
giving the number, " Mary B. Smith, $25,000," and then a
memorandum of the securities corresponding with the descrip-
tion in the complaint.

SICKELS — VOL. LXX.    10

The defendant also put in evidence the transfer already referred to. Upon the face of these instruments, what was the transaction? Nothing but a loan to Mrs. Smith upon her note secured by collaterals. The money which forms its consideration was paid to her, and her receipt is the defendant's voucher. The name of Albert S. Warner, managing executor of the estate of R. S. Burrows, deceased, is also signed to the note, and the defendant holds the certificate of stock as collateral to the note. The assignment of that certificate is executed by Warner under the same description, and, in the note to which I have referred, the shares of stock so pledged are declared to be " the property of said Mary Burrows Smith ; " and if the pledge is enforced upon non-payment of the note, as it may be by sale, "the surplus of the proceeds, if any, are by its terms to be accounted for by the trust company to her," Mrs. Smith. Mrs. Smith had paid nothing for the stock, and judgment has gone against her in this action. It would be difficult, I think, to imagine a plainer case of contrivance to produce a *devastavit* — a wasting of assets — than is presented upon these papers. They represent the contract, the intention, the purpose of these several parties. They show that the defendant had actual knowledge that the shares were, in fact, the property of the decedent; the certificates of stock were still in his name. They also show that the defendant, and the person they describe as the managing executor of the estate of the decedent, contrived together and with Mrs. Smith, to describe and assert the shares to be the property of Mrs. Smith. So the money goes to her. And there was not one moment of time during which the transaction was taking place, or in which it was consummated, that the money advanced became assets in the hands of the executors of the estate of Burrows. In fact, the executor got nothing applicable in any manner to the trusts for which he held the assets, in lieu of what he so parted with. It does not at all aid the defendant to suppose that, by some undisclosed arrangement between himself and Mrs. Smith, the money would ultimately enure to the benefit of the estate. The

question relates to the defendant's contract. It neither paid nor agreed to pay Warner anything, but took the stock avowedly on account of moneys advanced to Mrs. Smith, by an assignment to secure a debt from her with a trust, not merely implied but expressed, to account for the surplus, not to the executor, but to Mrs. Smith. The question is, how does the contract of the defendant, if carried out, leave the estate, not is there a contract between Smith and Warner, and will it be carried out or can it be enforced? The fact that the company was told that the estate was to have the benefit of the money, or that "the money was going to the benefit of the estate," or that the company so assumed, does not, in the least, alter the case. There is no room to doubt that, under the circumstances referred to, the transfer was an abuse of the trust reposed in the executor. The defendant received it with knowledge that the assignment was made not in the due course of administration, but as a pledge to secure credit for Mrs. Smith. This fact must be in some way explained or it is conclusive in favor of the appellant and a perfect answer to the judgment appealed from.

It is said, therefore, in behalf of the respondent, that the check after being indorsed by Mrs. Smith, through her agent, was delivered to Warner and that Warner deposited it in the Third National Bank of New York. The evidence of that is found in the testimony of the cashier of the First National Bank of Albion, who states: "There is charged on the books of the First National Bank of Albion, to the Third National Bank, as follows: Amount deposited by A. S. W., president, $25,000; these initials meaning Albert S. Warner." It is then said that "Mrs. Smith appears to have taken no further part in the transaction." This is not strictly accurate. There is no evidence that she did take any further part in the transaction, and from the evidence as it stood, it might be a fair inference that she did not. It is at this place, therefore, that the appellant's first point may be considered, viz.: "The trial judge erred in excluding evidence that the money received from the trust company was deposited to the credit of the

defendant, Mary Burrows Smith, in the First National Bank of Albion, and drawn out upon her checks."

Upon the face of the papers the money was the money of Mrs. Smith. The check had been indorsed by her through her agent, in blank, and when produced in evidence bore this indorsement: "Pay to G. L. Hutchings, cash for collection, or order. Signed, A. S. Warner, Pres't." Hutchings was the cashier of the Third National Bank, and the check was so collected. This constituted the deposit to which the cashier of the First National Bank of Albion testified. The plaintiff thereupon offered to show that the $25,000 was credited to Mary Burrows Smith upon the books of the First National Bank of Albion; that it was subjected to her checks, and that none of it was ever credited to the estate or to the executors, and more to the same end. Upon the defendant's objection, the evidence so offered was excluded. The evidence was, we think, competent. If received, it would have answered the suggestion that Mrs. Smith's connection ceased at the consummation of the loan, and that her participation in it was "solely for the purpose of assisting Warner to obtain the loan for the benefit of the estate."

Some evidence had been given, tending, as it might perhaps be said, to sustain the allegation of the defendant as set out in its answer, "that Warner, as executor, drew the money (on the $25,000 check), and applied the same for the benefit of the estate, in paying the debts thereof." If that were true — if debts of the testator had, in fact, been paid by means of the advance or loan of the money in question, the defendant might possibly be permitted to retain the shares of stock still in its hands, until reimbursed for the amount so in fact applied. That was one aspect of the case, and to rebut any such supposable inference the evidence should have been received.

It is urged, however, by the learned counsel for the respondent that the loan was, in fact, made to Warner as executor, and not to Mrs. Smith. That is also, as we have seen, the finding of the learned court. This proposition is opposed to every

fact in the case, and can be sustained only on the assumption that the transaction, as it appears upon its face, was a mere sham. The features of the case, when looked at in the light of the argument of the respondent, are very unusual. Not only do the papers represent the loan to have been made to Mrs. Smith, and describe the collateral shares as her property, but the contemporaneous entry upon the defendant's books, a record which for many reasons should speak the truth and declare the understanding of a party having such relations of confidence to the community as does the defendant, declares the same thing. Such, also, is all the oral testimony.

The defendant's reliance is upon the general rule which relieves a purchaser from any concern as to the disposition by the executor of the purchase-money. But this rule applies only where the purchaser relies upon the authority implied in the official character of the executor and deals with him as with one exercising a power. In such a case, if .the executor misapplies the money, the remedy is not against the purchaser. But for other dealing, where the purchaser relies upon the representations of the executor, who is not acting in the course of administration, he takes the chance.

In the case before us the transaction was out of the ordinary course and unnatural. The defendant not only did not trust to the executor in his official capacity, but refused to do so, and either suggested or approved a scheme which, carried out, necessarily defrauded the estate. The defendant could escape the consequences in no other way than by ascertaining whether there were debts or other obligations of the estate, and seeing to it that the money paid was applied upon them. Assuming, as does the judgment of the Special Term, that the defendant was guilty of no intentional wrong, it is impossible to find in the evidence circumstances indicating good faith or other reason why the loss, if any there be, should not fall upon the defendant, whose negligence at least co-operated with the intent of Warner, and enabled him, as it now appears, to pervert the estate committed to him. Neither the rule of the common law, invoked by the respondent, nor the

statute (1 R. S., tit. 2, pt. 2, chap. 1, § 66, p. 730), if it applies, relieves either a purchaser or mortgagee who is a party to a breach of trust, nor does either afford him any protection. Under the statute (*supra*) that person only who actually and in good faith pays money to a trustee, which the trustee, as such, is authorized to receive, is discharged from seeing to the application, or being answerable for the misapplication thereof. Here neither condition existed. There can be no presumption in favor of the propriety of the transaction, and the payment of money to Mrs. Smith, upon her voucher, is entirely inconsistent with the probability that it was advanced for any purpose for which Warner might borrow as executor.

If the defendant had dealt with Warner as the only resident acting executor, under the representation that the money was wanted for the purposes of the estate, or if without any representation it had advanced the money upon his application, the pledge of the stock would have been valid so far as respects the general power of the executor. In that case the money advanced would have taken the place of the pledge and stood as assets in his hands. But, as we have seen, this was not done. The defendant, when applied to for money; postponed its answer and may be presumed to have made all proper inquiries; and as the result at first declared that "the consent of the executors living" was necessary, then agreed to make the loan provided "a majority of the executors sign the note and agree at the same time in writing that they will get the consent of the remaining executors." As there is nothing in the evidence to show that money was, in fact, needed for any purpose connected with the estate, it may be assumed that an application to the other executors would have failed and their sanction to the pledge been withheld, and against the impending danger the estate would have been secure. At this point, however, the transaction ceased to be within the general power of the executor, and became one altogether outside of and contrary to it. The loan was not made to the executor and it at once concerned the lender to see that the money was properly applied to the use of the estate. Until that was done the

·defendant dealt at its peril, for it knew from the face of the proceeding that such application, if actually intended, depended upon the will and consent of Mrs. Smith, and was not at all at the sole option of the executor.

But it is enough for our present purpose that the defendant knew that the transaction was not within the usual course of administration, and it was bound to know that the property ·of the estate and the rights of the beneficiaries of the testator were put in jeopardy by its negligent, if not fraudulent, co-operation.  The impropriety of the transaction was obvious enough, and its conduct a clear violation of that perfect good faith which the law exacts from persons dealing with an executor or other trustee, respecting trust property.  The defendant, therefore, comes directly within the rule which requires the person taking it for an object, other than the general purposes of the trust, or such as may reasonably be supposed to be within its scope, or in any manner contrary to the duty of the office of executor, to look to the authority of the trustee, or he will act at his peril.  Here, in form, the loan was made to Mrs. Smith.  It was also a loan to her in substance ; technically and practically she became debtor to the defendant, and it was only by agreement between the executor and defendant that that portion of the testator's estate, represented by the stock in question, came into the hands of the defendant as a pledge or security for that indebtedness.  Concerning such or like circumstances, the decisions are all one way and are very numerous.  They are summed up in *Colt* v. *Lasnier* (9 Cow. 320, 342), by SAVAGE, Ch. J., saying : " The correct rule, both in England and in this state, is, that any person receiving from an executor the assets of his testator, knowing that this disposition of them is a violation of his duty, is to be adjudged as conniving with the executor; and that such person is responsible for the property thus received, either as a purchaser or a pledgee."  The rule, thus enunciated more than fifty years ago, has at no time been weakened or doubted.

I have examined the cases cited by the learned counsel for the defendant and find none which at all questions it.  Upon

Statement of case.

principle it applies here, and no conclusion would appear to be clearer or more inevitable than that the plaintiff, as a party representing the estate of the decedent, is entitled either to an immediate and unconditional return of the securities, or to their return upon paying such sum of money as shall equal the amount of those moneys actually applied by Warner upon the debts of the estate, if any, and the burden of showing that is with the defendant. Upon the case, as it now appears, equity and justice require that the appeal should succeed.

The judgment of the courts below should, therefore, be reversed, a new trial granted, with costs to abide the event.

All concur.

Judgment reversed.