MARY KELLEY, as Administratrix of the Estate of ELLEN NEVILLE, Deceased, Appellant, v. THE BUFFALO SAVINGS BANK, Respondent.

1. SAVINGS BANKS — CARE REQUIRED IN MAKING PAYMENTS FROM DEPOSITOR'S ACCOUNT AFTER HIS DEATH. The only practicable general rule to which savings banks can be safely held in relation to the degree of care which they must exercise in paying money out of a depositor's account after his death, upon the production of his bank book and the presentation of a draft purporting to bear his signature, when the bank has had no actual notice of the depositor's death, and nothing has trans-

pired to charge it with knowledge of that fact, is the rule of ordinary care, leaving it to be applied in the light of the special circumstances that characterize each separate case.

2. SAME. A conclusion of law that a bank exercised due care and caution in making a payment in a particular case is not warranted where there is a finding that it failed to make a physical comparison of the signature to a draft with the signature on file in the bank and there are no findings showing such omission to be excusable.

*Kelley* v. *Buffalo Savings Bank,* 88 App. Div. 374, reversed.

(Argued October 14, 1904; decided December 30, 1904.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the fourth judicial department, entered November 17, 1903, affirming a judgment in favor of defendant entered upon dismissal of the complaint by the court at a Trial Term without a jury.

The action is brought by the administratrix of Ellen Neville, deceased, to recover from defendant bank the amount of certain deposits which with interest up to the time of the commencement of the action, were said to have amounted to upwards of $2,100.

The material facts as found by the trial court and unanimously affirmed by the Appellate Division are substantially as follows: On the 30th day of January, 1871, the plaintiff's intestate, Ellen Neville, then about eighteen or nineteen years of age, opened an account with the defendant bank. A bank book was issued to her in her name and she signed her name in the signature book kept by the defendant for purposes of identification. At the time when this account was opened there were in force certain rules adopted by the defendant, which were posted in a conspicuous place in its banking room and also printed in each pass book issued by it. One of these rules provided that "*the secretary will endeavor to prevent frauds, but all payments made to persons producing the deposit books or duplicates thereof, shall be good and valid payments to the depositors respectively.*" Another rule provided that "*on the decease of any depositor the amount standing to the credit of the deceased shall be paid to his or her legal representatives when legally demanded.*"

During the lifetime of Ellen Neville she made sixteen deposits to the credit of this account, presented her book to the defendant fifteen times for the purpose of having interest credited thereon, and drew two checks upon said account, one dated September 22nd, 1873, for $335.98, and the other dated July 7th, 1877, for $23.31. These were presented with her pass book and she received the money thereon. She died on or about the 1st day of December, 1878, at the age of about twenty-five or twenty-six years, and at the time of her death there remained to her credit on said account the sum of $884.43. This is the amount, with compound interest, which the plaintiff seeks to recover in this action.

Ellen Neville left her surviving her sister, the plaintiff, another sister named Kate, and her mother. At the time when this account was opened they all lived together in the city of Buffalo. Each of Ellen's sisters had a bank account of her own.

Nearly twenty-three years after Ellen's death and on the 22nd of May, 1901, the plaintiff applied for and received letters of administration. About ten years ago the mother and sister Kate became inmates of St. Francis' Asylum for the Aged and Infirm of Buffalo, where they remained until the time of their deaths, which occurred about two or three years, respectively, before the trial. When they entered this asylum they paid to it the sum of $1,000.

When Ellen died on December 1st, 1878, her bank book was in the house where the whole family then lived, and was taken possession of by her mother or her sister Kate or the plaintiff. Subsequent to Ellen's death the bank book was presented to the defendant by the mother or the sister Kate or the plaintiff for the purpose of having interest credited thereon on ten different occasions between the 1st of January, 1879, to and including July 1st, 1883, and on the 4th day of March, 1882, the pass book was presented by some person unknown to the defendant (such person so presenting said book being the mother, the sister Kate or the plaintiff), and a deposit of $70 was duly made and entered therein.

Subsequent to Ellen's death the moneys to the credit of this

account were paid out by the defendant on five separate drafts or written orders drawn in the name of Ellen Neville, as follows: December 28th, 1878, $41.43; June 2nd, 1880, $50; July 30th, 1881, $70.45; August 14th, 1883, $56.62; September 1st, 1883, $937. No part of these moneys was paid to the legal representative or representatives of Ellen Neville, but the payments referred to were made to her mother or to one of her sisters, and the signatures on these five drafts or orders purporting to be the signatures of Ellen Neville were not her signatures but were made by her mother or one of her said sisters.

The findings relating to the conduct of the bank officials in the payments of these drafts are as follows: "That by a critical examination and comparison of the said signatures on each of the aforesaid drafts or orders, with the true signature of said Ellen Neville, entered and signed as aforesaid in the book of signatures, it would have been apparent to a competent bank officer that neither of the signatures to said drafts or orders was the genuine signature of said Ellen Neville."

"That at the respective times at which such drafts or orders were presented to the defendant for payment, the defendant made no critical examination or physical comparison of the signatures thereon with that of the said Ellen Neville entered and signed in the book of signatures of depositors kept by the defendant aforesaid."

"That said drafts or orders were paid by defendant on presentation of the same with the pass book, and the defendant made no effort by a critical examination or physical comparison to ascertain the genuineness of the signatures of any of said drafts or orders, or to ascertain the identity of the person presenting the same."

"That there does not exist such a disparity or difference between the signature of said Ellen Neville upon the signature book of the defendant and the several signatures upon said five checks, or any or either of them, as to create doubt or misgiving concerning the genuineness of said five signatures, or any or either of them, in the mind of a competent and

reasonably careful bank officer, when presented by a person unknown to him with the bank book, and, therefore, the defendant exercised due care and caution, and was not guilty of negligence in paying the five checks in question, nor in paying any or either of them."

These findings of fact were followed by the legal conclusion that the complaint should be dismissed, and the judgment entered thereon has been unanimously affirmed by the Appelate Division.

*Harry D. Williams* for appellant. The defendant should be held liable for the breach of its express agreement that "On the decease of any depositor the amount standing to the credit of the deceased shall be paid to his or her legal representatives when legally demanded." (*Mahon* v. *S. B. S. Inst.*, 175 N. Y. 69; *Podmore* v. *S. B. S. Inst.*, 48 App. Div. 218; *Hoffman* v. *U. D. Inst.*, 41 Misc. Rep. 517; *Marlett* v. *Jackman*, 3 Allen, 287; *Weber* v. *Bridgman*, 113 N. Y. 600; *F. L. & T. Co.* v. *Wilson*, 139 N. Y. 284.) The fact of unauthorized payment having been established, the burden was on the defendant of showing affirmatively some valid reason for such payment. (*Abramowitz* v. *C. S. Bank*, 17 Misc. Rep. 298; *Allen* v. *W. S. Bank*, 69 N. Y. 317; *Farmer* v. *M. S. Inst.*, 60 Hun, 462.) The defendant failed to meet the burden imposed on it and did not make out a defense. (*Bank* v. *Mason*, 95 Penn. St. 113; *C. Nat. Bank* v. *Alexander*, 120 Penn. St. 476; *G. Bank* v. *Husted*, 42 Ark. 62.)

*Adolph Rebadow* for respondent. The by-law which reads, "On the decease of any depositor the amount standing to the credit of the deceased shall be paid to his or her legal representatives when legally demanded," cannot be invoked here. (*Farmer* v. *M. S. Inst.*, 60 Hun, 462; *Mahon* v. *S. B. S. Inst.*, 175 N. Y. 69; *Hoffman* v. *U. D. S. Inst.*, 41 Misc. Rep. 517; 95 App. Div. 329; *People ex rel. M. S. R. Co.* v. *Tax Comrs.*, 174 N. Y. 417; *Podmore* v. *S. B. S. Bank*, 48 App. Div. 221; *Donian* v. *P. Inst.*, 127 Mass. 183.) The

defendant under by-law XXI was only required to use ordi-
nary care and diligence, and it having performed its duty in
that respect, it is relieved from liability. (*Reed* v. *McCord*,
160 N. Y. 330; *McGuire* v. *B. T. Co.*, 167 N. Y. 208;
*Appleby* v. *E. C. S. Bank*, 62 N. Y. 12; *People* v. *T. A. S.
Bank*, 98 N. Y. 661; *Wall* v. *E. I. S. Bank*, 64 How. Pr.
252; *Hales* v. *Seaman's Bank*, 28 App. Div. 409.)

WERNER, J. Upon the foregoing facts the trial court dis-
missed the complaint. At the Appellate Division the judg-
ment entered upon that decision was unanimously affirmed.
This court must, therefore, assume that every fact found is
based upon sufficient evidence (*Marden* v. *Dorthy*, 160 N. Y.
39; *Reed* v. *McCord*, Id. 330; *People ex rel. Manhattan Ry.
Co.* v. *Barker*, 152 N. Y. 417), and the judgment must be
sustained unless the conclusion of law upon which it is predi-
cated is erroneous, or other fatal errors affect the rulings
made upon the trial.

The immediate question presented by this appeal is whether,
upon the record before us, the plaintiff is entitled to recover,
and, as the decision of this question necessarily involves an
inquiry into the duties and responsibilities of savings banks
toward their depositors, the case is one of more than ordi-
nary professional interest and practical importance. Savings
banks are prominent factors in our modern business life.
Many of them count their deposits by the millions and
number their depositors by the thousands. Many, if not most,
of these depositors are persons in the humbler walks of life,
living in widely scattered sections of their respective com-
munities, visiting the banks infrequently, having no personal
acquaintance with bank officials or employees, and no con-
venient or satisfactory means of immediate identification
when their identity is questioned. These conditions are in
striking contrast with those which prevail in the intercourse
between the officers and employees of discount banks and
their patrons. The majority of the latter are persons actively
engaged in business, making daily or at least frequent visits

to their respective banks. Their signatures are familiar to the officers and employees of the banks, and if, now and then, there is need of identification it can usually be furnished without much difficulty. These considerations clearly indicate the difference between the two classes of banks, as well as the necessity for the law which permits savings banks to adopt reasonable rules adapted to the nature of their business, which rules, when properly adopted and promulgated, are binding upon them, their depositors and those who succeed to their interests. Outside of these special rules, however, there are many questions affecting the interests of savings banks and their depositors which must be determined by broad and comprehensive legal rules of general application. One of these questions arises out of the relations between savings banks and the legal representatives of deceased depositors. What degree of care must a savings bank exercise in paying money out of a depositor's account after his death, upon the production of his bank book and the presentation of a draft purporting to bear his signature, when the bank has had no actual notice of the depositor's death, and nothing has transpired to charge it with knowledge of that fact? That is the question which underlies all other questions in this case.

In view of what has been said concerning the relations of savings banks and their depositors towards each other, it becomes obvious that any general rule that would require savings banks to act in such circumstances at their peril, without regard to the degree of care exercised, would ultimately cast as great a burden upon depositors and their legal representatives as upon the banks, and would disastrously affect the beneficent work which such institutions are designed to accomplish. If it were the duty of savings banks to establish at all hazards the identity of every person presenting a depositor's bank book and draft, it would be quite as impossible for them to continue business as it would be for some persons to avail themselves of the best-known and most generally approved method of investing and accumulating the fruits of frugal and patient economy. The same would be true of any other rule

12

so onerous in its operation that such institutions could not do business without great inconvenience both to them and their depositors. A single illustration will suffice to demonstrate this. Take the case of a large savings bank with so many accounts that it is impossible for the paying teller to know each depositor. It would be utterly impracticable to do business if each application for a withdrawal of money had to be delayed until a searching inquiry could be made as to the regularity of the transaction. But even if such a course were possible, so far as the bank were concerned, what would be the effect upon the poor and unknown depositor whose place of residence may be remote from the banking house and who may have no acquaintance with any one who would be of the slightest assistance in identifying him? He would have no way of getting money that rightfully belonged to him, or, at least, might find his efforts in that direction so burdensome as to amount to the same thing. This is not an extreme illustration, but one that is fairly typical of the relations between great savings banks located in large centers of population with many depositors whose accounts are small and whose deposits are made at rare intervals. Upon reflection it becomes obvious, therefore, that the only practicable general rule to which savings banks can be safely held in such dealings is the rule of ordinary care, leaving it to be applied in the light of the special circumstances that characterize each separate case. This is the rule that has been laid down by this court in a variety of similar cases. (*Schoenwald* v. *Metr. Savings Bank*, 57 N. Y. 418; *Appleby* v. *Erie Co. Savings Bank*, 62 N. Y. 12; *Kummel* v. *Germania Savings Bank*, 127 N. Y. 488.)

In the case of *Allen* v. *Williamsburgh Savings Bank* (69 N. Y. 314) the wife of a depositor had wrongfully secured possession of his pass book, forged his signature to a draft and obtained payment from the bank. But there the bank had adopted a special by-law requiring it to use its best efforts to prevent fraud, and this was construed to bind the bank to a higher degree of care than that enjoined by the general rule.

It is to be observed that all of the cases above cited present

instances of payments to the wrong persons during the lifetime of the depositors, and it is true that in construing certain rules, so generally adopted by savings banks as to have acquired almost the binding force of statutes, it has been held by this court that there is a difference between the relations of a savings bank and a living depositor on the one hand, and the relations of such a bank and the legal representatives of a deceased depositor on the other hand.

The rules referred to are among the by-laws adopted and promulgated by the defendant bank, and are as follows: " The secretary will endeavor to prevent frauds, but all payments made to persons producing the deposit books, or duplicates thereof, shall be good and valid payments to the depositors respectively."

" On the decease of any depositor the amount standing to the credit of the deceased shall be paid to his or her legal representatives when legally demanded."

In the recent case of *Mahon* v. *South Brooklyn Savings Inst.* (175 N. Y. 69), we had occasion to discuss the effect of these two rules, and as bearing upon the defense that the bank had exercised due diligence in paying out money upon the account of a deceased depositor, we said, " the rule of diligence invoked by the defendant applies only to the case of a living depositor. When, through a depositor's carelessness, his bank book gets into the hands of a third person who presents it to the bank, the latter may show its care and diligence in making payment to the person presenting the pass book, and thus protect itself against a second demand for payment by the careless depositor. But the by-law which is designed to protect the bank in such a case must be read in connection with the other by-law, which provides that after the depositor's death payment must be made ' to his or her legal representatives.' This latter by-law is for the protection of the depositor who can no longer protect himself, and, therefore, the bank is bound to see that payment was made to the proper person. Payment to any other person is made at the bank's peril." That case is now relied upon by the appellant. As

applied to the facts there established, the language just quoted was precise and correct, because the bank had knowledge of the depositor's death, and assumed to pay out the money credited to her account to one who claimed it by virtue of an alleged gift *causa mortis*, which the trial court found had never been made, and the unanimous affirmance of that finding of fact by the Appellate Division left this court no alternative but to apply the rule there laid down.   In that case the finding of fact clearly established the absence of ordinary care, and the decision reached by this court was the only logical sequence of the finding.   The language of the opinion is general and comprehensive, but of that it is enough to say that judicial discussion is to be limited to what is actually decided.   (*People ex rel. Metr. St. Ry. Co.* v. *State Board of Tax Comrs.*, 174 N. Y. 417.)

In the case at bar the situation is different.   While there is no direct finding to the effect that the officers of the respondent bank had no knowledge of Ellen Neville's death, that is the direct and inevitable implication of the other findings, and thus the question that remains to be discussed is whether the findings as to what the officers of the bank actually did support the legal conclusion that they were not guilty of negligence in making payments to the persons who presented the decedent's pass book and drafts purporting to have been signed by her.   The substance of the findings upon that subject is that a critical examination and comparison of the signatures on the several drafts referred to with the true signature of the decedent would have disclosed the fact that the signatures on the drafts were not genuine ; that the officers of the bank made no critical examination, *or physical comparison of the signatures* on the drafts with the genuine signature of the decedent, entered and signed in the bank's signature book, and that the officers of the bank made no effort by a critical examination, *or physical comparison*, to ascertain the genuineness of the signatures on the drafts, or to ascertain the identity of the person presenting the same.   The use of the disjunctive "or" in these findings separates that portion of

them which relates to a critical examination of the signatures from that which relates to a physical comparison thereof, and fairly construed they import that no physical comparison of the signatures was made by the officers of the bank.

These two findings are not necessarily inconsistent with each other, but they are so divergent as to entitle the appellant to the benefit of the one most favorable to her. (*Redfield* v. *Redfield*, 110 N. Y. 671.) Whether the failure to make a physical comparison of the signatures in the case at bar was consistent with the exercise of ordinary care on the part of the defendant bank may depend upon peculiar facts which are not found in the record before us. The finding quoted in the foregoing statement of facts, to the effect that there was no such disparity or difference between the signature of said Ellen Neville upon the signature book of the defendant and the several signatures upon five checks, as to create doubt or misgiving concerning the genuineness of said five signatures in the mind of a competent and reasonably careful bank officer, when presented by a person unknown to him with the bank book, and that, therefore, the bank exercised due care and caution and was not guilty of negligence is really a conclusion of law and not a finding of fact.

It is possible that there may be special cases in which it may not be necessary for bank officers to make a physical comparison between one signature on file with a bank and another upon a draft or check presented to it for payment, but if so, there must exist some unusual and pertinent excuse that is not discoverable in the findings now before us tending to show that the failure to make such a comparison is not at variance with the requirements of ordinary care. We think the finding most favorable to the appellant, to wit, that the defendant made no physical comparison of the signatures upon the five drafts with the signature of Ellen Neville in the defendant's signature book does not support the conclusion of law to the effect that the complaint should be dismissed, and for that reason the judgment herein should be reversed.

This view of the case renders it unnecessary to pass upon

the exceptions to rulings that may not be repeated upon another trial, nor upon the extent of the appellant's rights in case she should recover a judgment and it should appear that, as one of the surviving sisters of Ellen Neville, she has already received a part of the fund which she now seeks to get in her representative capacity.

The judgment herein should be reversed and a new trial granted, with costs to abide the event.

Vann, J. I concur for reversal, but upon a more radical ground. While the defendant could have adopted a rule that would cover a payment made in good faith to a person in possession of the pass book of a deceased depositor, it had not done so when the payments in question were made. As its rules then stood such a payment bound the depositor while he was alive, but did not bind his estate after he was dead, for they expressly provided that "on the decease of any depositor the amount standing to the credit of the deceased shall be paid to his or her legal representatives when legally demanded." This rule is absolute and a part of the contract. It is the law of the case made by the parties. The language is that of the bank and, hence, if ambiguous, is to be construed in favor of the depositor, who is not responsible for the ambiguity. If we add to it in effect the proviso "but payment to one presenting the pass book of a deceased depositor shall be good unless the bank has notice of the death," we make a new contract. I repeat as applicable to the case in hand what we recently said in another case: "This latter by-law is for the protection of the depositor who can no longer protect himself, and, therefore, the bank is bound to see that payment was made to the proper person. Payment to any other person is made at the bank's peril." (*Mahon* v. *South Brooklyn Savings Institution*, 175 N. Y. 69, 72.)

Cullen, Ch. J., O'Brien, Bartlett, Haight and Martin, JJ. (and Vann, J., in result in memorandum), concur with Werner, J.

Judgment reversed, etc.