## Saji v. Philadelphia Saving Fund Society

*Samuel F. Pepper*, for plaintiff; *J. Wesley McWilliams*, for defendant.

SMITH, P. J., March 9, 1933.—The plaintiff, who for many years had a savings fund account in the defendant society, on April 20, 1930, advised it that

she was going to visit her brother Simon in Roumania and left with the defendant her pass or deposit book. On August 16, 1930, the defendant received a letter as follows:

"To The Saving Fund Society
    "Philadelphia
    "700 Walnut Street
  "I have left my saving book No. 1551940 in your office. Now I beg you dear sir be so kind send the sum of 1000 dollars one thousand Dollars to my brother Simon Saji Halmei Jnd. Salmar. Roumania.

"I remain
"With my greatest respect
"MARI SAJI
"My address: Mary Saji c/o Simon Saji
"Halmei Jnd. Satmar
"Roumania

"Halmei 930. VII. 30
  GROSZ MIKSA
  YAKOB SAMU."

The letter was written in a very good hand, admittedly not that of the plaintiff, and at the end thereof was a signature purporting to be that of the plaintiff. After having the letter examined by two of its employes, the defendant forwarded to the brother of the plaintiff the sum of $1000. When the plaintiff returned to Philadelphia in 1931 and was informed of the withdrawal from her account, she denied that the signature was hers and demanded the payment of the $1000. When the defendant refused to reimburse her in that sum she brought suit. The jury gave to the plaintiff a verdict in the sum of $1122.75. The defendant has filed motions for a new trial and for judgment n. o. v.

The rules of the defendant which were in evidence provide: "If a depositor shall be unable to attend in person to receive money, the same may be withdrawn [after due notice], by power of attorney, or order signed by the depositor and acknowledged when required." The letter in question is in the nature of an order.

A savings bank is not required to exercise the same degree of care as a commercial banking institution in making payments to depositors or on their orders. In the cases of the latter banks a customer may recover in a legal action upon proof of a forgery when the bank has paid from his account on a forged instrument. The savings bank is held only to the exercise of ordinary care in paying out money on what appears to be a depositor's order. In Kelley v. Buffalo Savings Bank, 180 N. Y. 171, 177-178, it is held:

"In view of what has been said concerning the relations of savings banks and their depositors towards each other, it becomes obvious that any general rule that would require savings banks to act in such circumstances at their peril, without regard to the degree of care exercised, would ultimately cast as great a burden upon depositors and their legal representatives as upon the banks, and would disastrously affect the beneficent work which such institutions are designed to accomplish. If it were the duty of savings banks to establish at all hazards the identity of every person presenting a depositor's bank book and draft, it would be quite as impossible for them to continue business as it would be for some persons to avail themselves of the best-known and most generally approved method of investing and accumulating the fruits of frugal and patient economy. The same would be true of any other rule so onerous in its operation that such institutions could not do business without great inconvenience both to them and their depositors. A single illustration will suffice to demonstrate this.

Take the case of a large savings bank, with so many accounts that it is impossible for the paying teller to know each depositor. It would be utterly impracticable to do business if each application for a withdrawal of money had to be delayed until a searching inquiry could be made as to the regularity of the transaction. But even if such a course were possible, so far as the bank were concerned, what would be the effect upon the poor and unknown depositor, whose place of residence may be remote from the banking house, and who may have no acquaintance with any one who would be of the slightest assistance in identifying him? He would have no way of getting money that rightfully belonged to him, or, at least, might find his efforts in that direction so burdensome as to amount to the same thing. . . . Upon reflection it becomes obvious, therefore, that the only practicable general rule to which savings banks can be safely held in such dealings is the rule of ordinary care, leaving it to be applied in the light of the special circumstances that characterize each separate case."

The sole question here is: Did the defendant exercise ordinary care in making payment on the order to ascertain if the signature at the end thereof was that of the plaintiff? In Appleby v. Erie County Savings Bank, 62 N. Y. 12, 18, it is stated:

"In this case if the two signatures were so dissimilar as when compared the discrepancy would be easily and readily discovered by a person competent for the position [by teller], then the failure to discover it would be evidence of negligence which should have been passed upon by the jury. It would not be evidence of negligence if the difference was not marked and apparent, or if it would require a critical examination to detect it, and especially if the discrepancy was one as to which competent persons might honestly differ in opinion."

An examination of the signatures of the plaintiff on the statement of claim, the signature card of the plaintiff left at the savings fund society and other admitted standards shows a marked resemblance to the signature purporting to be that of the plaintiff on the order sent from Roumania for the withdrawal. The pass book of the plaintiff was left by her with the defendant when she advised them that she was going to Roumania to visit her brother, the letter came from Roumania asking that payment be made to the same brother, and reference in the letter was made to her savings book, No. 1,551,940, with the proper address of the defendant in the letter. In Bulakowski v. Phila. Saving Fund Society, 270 Pa. 538, 544-545, Kephart, J., said:

"When the pass-book was presented and the receipt taken, it was the duty of the bank officials to compare it with the original identification card, and, by the use of due diligence, ascertain if they were written by the same person. The payment was induced by the possession of the pass-book, the comparison of the signatures, and, if necessary in any case, examination as to contents of the identification card. But if want of care may be established by showing that, in the comparison of signatures, after a most searching examination and investigation under a high power magnifying glass, certain dissimilarities appear which have a tendency to disclose a forgery, then the careful scrutiny of signatures by the bank officer, acting in good faith, goes for naught; the bank becomes an insurer against loss in all cases and care of the highest degree is substituted for that of ordinary diligence. The question would then be: Is the signature genuine? This is wrong; the inquiry should be: Did the signature on the receipt so closely resemble the one on the identification card that a person occupying the position of paying teller, or such other officer, would believe it to be genuine and pay on account of it? It may not be a genuine signature; defendant was not required to so establish it, to be relieved from liability."

As was said by Kephart, J., in the above-quoted case: "The general characteristics of the signature, to our unskilled eye, so much resemble those of the original that we would not hesitate to take it as such."

As to the evidence of what care was exercised by the defendant, the plaintiff herself identified the signature on the pass book as her own. She denied that the signature on the statement of claim was her signature. She admitted that the signature on the disputed letter was her signature. She denied that a signature on a receipt signed July 23, 1930, for $30 was her signature. She later, when the whole of the disputed letter was read to her, denied that it was her signature since she had signed no letter.

Mr. Arthur Graham, the chief teller of the defendant savings fund society, testified that he has been employed in the bank for forty years and as an examiner of signatures for twenty-five or thirty years; that he examined the signature on the disputed letter and approved of it and placed his initials thereon; that in his opinion the signature on the letter is genuine, and at his request the money was paid.

Mr. Alfred Bauer testified that he was the assistant manager of the foreign department of the defendant and that he issued the draft payable to Simon Saji; that the draft was paid in Bucharest, Roumania, and that the endorsement contains the name of Simon Saji.

Mr. Levi Wire testified that he is assistant to the controller of the defendant; that he has been employed there for 12½ years; that for ten years he has been comparing signatures at the rate of about 5000 a year; that he saw the disputed letter at the bank; that he examined the signature thereon and compared it with the signature of the depositor given when her account was opened and that they corresponded and it was genuine; that he placed his initials on the order indicating his approval; that after he had approved the signature as genuine he sent it to Mr. Graham. He further testified as to the method of paying drafts by check and how he gave the draft to the mailing clerk to the order of Simon Saji for mailing, that the letter was addressed to Marie Saji, care of Simon Saji, and he identified the receipt thereof.

The evidence indicates that the defendant exercised ordinary diligence before causing the draft to be paid in accordance with the terms of the disputed order. The officials of the bank, with many years of experience comparing signatures, believed that the signature on the order was genuine. They made a double check on this signature. The documentary evidence shows each of their initials on the order. They have met the requirements demanded of officials in a savings fund society. There is no presumption of negligence on their part. The plaintiff having failed to meet the burden of proof demanded in showing a lack of ordinary diligence on the part of the defendant, a verdict of the jury in her favor cannot be justified.

### Decree

And now, to wit, March 9, 1933, the motion of the defendant for judgment n. o. v. is granted and the prothonotary is directed to note the judgment of record.

The motion for new trial is discharged.

An exception is allowed the plaintiff to this order.