Saji, Appellant, *v.* Phila. Saving Fund Society.

Argued October 4, 1933.

Before KELLER, CUNNINGHAM, BALDRIGE, STADTFELD, PARKER and JAMES, JJ.

*Herman P. Abramson*, and with him *Samuel F. Pepper*, for appellant.

*J. W. McWilliams*, and with him *A. F. Barbieri* and *D. H. Hamilton*, for appellee.

OPINION BY CUNNINGHAM, J., February 1, 1934:

Appellant was plaintiff below in an action of assumpsit and obtained a verdict against the defendant saving fund society for $1,122.75, but the court below, in banc and with the concurrence of the trial judge, granted defendant's motion for judgment in its favor notwithstanding the verdict; from the judgment so entered upon the whole record we have this appeal by the plaintiff.

We need not refer to the pleadings in detail; the sole issue at the trial, as stipulated by counsel on both sides, was whether defendant owed appellant, as one of its depositors, the sum of $1,000 with interest at four per cent. from August 18, 1930, to March 30, 1931, the date of demand, and at six per cent. from that date. The defense was that the money sued for had been paid to appellant's brother, Simon Saji, upon her written order, sent to, and accepted and honored by, defendant in accordance with its rules; appellant's reply was that what purported to be her signature to the order produced and relied upon by defendant was a forgery.

The following facts were established beyond controversy at the trial: Appellant became a depositor in the defendant savings bank on November 20, 1914, and placed her signature upon a signature card, numbered 1,551,940, which contained a provision that she agreed "to conform to the by-laws and regulations of [defendant] and any amendments thereto."

A deposit book, referred to as a pass book and bearing the same number as the card, was issued to her and the card placed in the files of defendant.

Among the few withdrawals made by appellant was one under date of September 13, 1917, of $20 and another on April 28, 1930, of $575.78, for each of which she signed a receipt, produced by defendant, along with her signature card, as exhibits. After the last mentioned withdrawal there was a balance of $4,000 to her credit in her savings account.

About April 30, 1930, she called at the bank, informed the employes in charge she was going on a visit to Roumania, left her deposit book (taking a receipt therefor), and advised defendant she would call for her book upon her return.

One of defendant's regulations provided: "If a depositor shall be unable to attend in person to receive money, the same may be withdrawn, by power of at-

torney, or order signed by the depositor and acknowledged when required."

Under the heading "Banking by Mail," certain of the rules read:

"The book unless in the society's keeping must be sent with the deposit.

"Withdrawals may be made by forwarding your book, stating the amount wanted and where to be sent."

On August 16, 1930, defendant received by mail the following request, the body of which was written by some person other than appellant, but purporting to have been signed by her and two witnesses:

"To

The Saving Fund Society
   Philadelphia
   700 Walnut Street

I have left my saving book No. 1551940 in your office. Now I beg you dear sir be so kind send the sum of 1,000 dollars one thousand Dollars to my brother Simon Saji Halmei Jnd. Salmar. Roumania.

I remain
With my greatest respect
Mari Saji
My address: Mary Saji c/o Simon Saji
Halmei Jnd. Salmar
Roumania

Halmei 930. VII. 30
Grosz Miksa
Yakob Samu."

Upon its receipt, Arthur G. Graham and Levi Wire, defendant's chief teller and assistant comptroller, respectively, each of whom has had many years experience in comparing signatures, compared the signature on the order with appellant's signature on her signature card, and, being of opinion that the order had been signed by appellant and having knowledge that

her deposit book was in the custody of defendant, authorized compliance with the order.

Defendant purchased from Philadelphia National Bank a draft, payable to the order of Simon Saji, for $1,000, less the exchange, mailed it to him by registered letter at the address specified, and produced at the trial the cancelled draft bearing the endorsement "Simon Saji" and the return registry receipt, purporting to have been signed by him.

Appellant, who can neither read nor write, with the exception of signing her name, testified she went to Roumania, was with her brother during July and August, 1930, and returned to America in February, 1931; that her brother knew of her deposit with defendant; that she placed the receipt for her deposit book in her passport and kept both in the house of her brother who had a relation able to write English; that she did not get the draft or money and did not know whether her brother got it.

Appellant's testimony, with respect to which of her purported signatures were genuine, was conflicting and uncertain, and some of it obviously mistaken. She stated her signatures upon her identification card and upon the above mentioned withdrawal receipts were genuine. When shown her signature on the disputed order by counsel for defendant she replied, "This is my signature"; but when the paper was read to her by her own counsel and she was asked whether she had signed it, her answer then was, "This here I did not sign. No, that is not my signature. I did not sign that," and added that she did not sign any letter in Roumania. Upon being shown her name below her affidavit to her statement of claim in this case, she denied having written it.

In rebuttal, appellant called Herman Barnett, experienced for thirteen years in making comparisons of signatures, who testified that a comparison of the

signature on the order with that upon the original card "would have a tendency to make [him] feel that it was not exactly the same handwriting." He was shown the above mentioned withdrawal slips (the genuineness of which was acknowledged by appellant) and expressed the opinion that they were not signed by the same person who signed the order, but materially weakened the force of his testimony when he said he "would have reason to doubt" that they were signed by the same person who signed the original signature card.

At the conclusion of the testimony the defendant presented a point for binding instructions. The learned trial judge, LAMBERTON, J., being then of opinion that appellant was entitled to go to the jury, refused the point. Adopting the language of Bulakowski v. Philadelphia Saving Fund Society, 270 Pa. 538, 113 A. 553, a case tried in 1921 against the appellee herein, he explained to the jurors the distinction between a savings bank and an ordinary commercial bank, and, with respect to the former, instructed them that as "the depositors are the only ones to derive a benefit, none being secured by the organizers or trustees, it has been deemed wise, as a matter of public policy, to adopt the rule of ordinary care with relation to funds on deposit." They were then told that the first question for them to determine was whether appellant signed the order in the form of a letter—an affirmative finding upon which issue would end the case and require a verdict in favor of the defendant. Upon the issue of negligence, the trial judge said: "If you think that that signature to the letter is a forgery, then we come to the other issue in the case, and that is the issue as to whether the bank exercised due care." This was followed by a correct exposition of the character and extent of the duty incumbent upon the officers and employes of a savings bank.

As the case now comes before us our inquiry must

necessarily be whether there was sufficient evidence of negligence upon the part of defendant's officials to justify the submission of that question to the jury. Although the evidence upon which the jury found appellant's signature to the order had been forged was unconvincing, (and neither side seems to have made any effort to procure the testimony of the witnesses to the signature on the order) we must now give her the benefit of every possible inference which might be drawn in her favor from the evidence and treat the finding of the jury as establishing a forgery.

It by no means follows, however, that such finding entitles appellant to recover. She was bound to go further and carry the burden of proving that defendant's employes had failed to exercise ordinary care in making their comparison of signatures, and that their belief that the signature on the order was genuine had not been arrived at through the exercise of reasonable care and diligence.

The principles of law applicable, in our opinion, to the case at bar were fully discussed by our Supreme Court in Bulakowski v. Philadelphia Saving Fund Society, supra. In addition to the regulations involved in the present case, defendant had a rule to the effect that if any person should present a deposit book pretending to be the depositor named therein and thereby obtain any part, or all, of the deposit and the actual depositor had not given previous notice of the loss or theft of the book, the society would not be responsible for the wrongful payment, etc. Bulakowski's book had been lost or stolen and was presented by a person impersonating him and who forged his name to the receipt. It was held that the burden was upon plaintiff to prove defendant had not used ordinary care in making payment to the forger. In holding that the court below erred in submitting that case to the jury, Mr. Justice KEPHART, after citing the cases establishing the general rules to which we have already re-

ferred, said: "When the pass-book was presented and the receipt taken, it was the duty of the bank officials to compare it with the original identification card, and, by the use of due diligence, ascertain if they were written by the same person. The payment was induced by the possession of the pass-book, the comparison of the signatures, and, if necessary in any case, examination as to contents of the identification card. But if want of care may be established by showing that, in the comparison of signatures, after a most searching examination and investigation under a high power magnifying glass, certain dissimilarities appear which have a tendency to disclose a forgery, then the careful scrutiny of signatures by the bank officer, acting in good faith, goes for naught; the bank becomes an insurer against loss in all cases and care of the highest degree is substituted for that of ordinary diligence. The question would then be: Is the signature genuine? This is wrong; the inquiry should be: Did the signature on the receipt so closely resemble the one on the identification card that a person occupying the position of paying teller, or such other officer, would believe it to be genuine and pay on account of it? It may not be a genuine signature; defendant was not required to so establish it, to be relieved from liability."

On the other hand, our case of Wronski v. Frankford Trust Co., 84 Pa. Superior Ct. 511, in which the facts differed materially from those here present, is an illustration of the kind of a case which should be submitted to a jury.

As was well said in Kelly v. Buffalo Savings Bank, 180 N. Y. 171, if savings banks—"the best known and most generally approved method of investing and accumulating the fruits of frugal and patient economy" —are to continue their business, the only practical rule applicable to them "is the rule of ordinary care, leav-

ing it to be applied in the light of the special circumstances that characterize each separate case.''

When that rule is applied to the circumstances in the case at bar, we think it is clear that appellant failed in her attempt to carry the burden resting upon her of showing negligence upon the part of defendant.

Indeed, the only circumstances relied upon by her as tending to show negligence were slight differences in the formation of the letters in the disputed signature as compared with her signature on the identification card. When it is recalled that a period of approximately sixteen years intervened between the affixing of these signatures, such dissimilarities would naturally be expected and, in the light of common experience, would not justify the submission of this case to a jury. More pronounced dissimilarities appeared in the signatures involved in the Bulakowski case, viz., the entire absence of a letter. Yet, it was there held that an omission of that nature did not amount to such a suspicious circumstance as should have put the employes of defendant on their guard.

We agree with the following statement in the opinion of SMITH, P. J., for the court below: ''An examination of the signatures of the plaintiff on the statement of claim, the signature card of the plaintiff left at the savings fund society and other admitted standards shows a marked resemblance to the signature purporting to be that of the plaintiff on the order sent from Roumania for the withdrawal.''

In commenting upon the similarities in the Bulakowski case, the writer of the opinion in that case said, ''The general characteristics of the signature, to our unskilled eye, so much resemble those of the original that we would not hesitate to take it as such.''

Counsel for appellant argue that the principle of the Bulakowski case, and of the cases cited therein, does not apply here because they were cases of payment to persons pretending to be depositors while this

is one of payment to a third person who made no such pretention. This argument overlooks the provisions we have herein quoted from the regulations of defendant, which not only contemplate but expressly provide for the method of payment here involved.

Nor, in view of the production by defendant of the cancelled draft, bearing the purported endorsements of appellant's brother and of the bank effecting the payment, and its possession of the return registry receipt, are we impressed with the argument that defendant failed to show payment of the money in controversy to appellant's brother.

It was contended on behalf of defendant that appellant's testimony disclosed contributory negligence upon her part; we prefer to base our decision upon her failure to show any negligence upon the part of defendant.

Our conclusion is that defendant's motion for judgment in its favor upon the whole record was properly granted; the several assignments of error are accordingly overruled.

Judgment affirmed.