**KELLY v. CENTRAL HANOVER BANK
& TRUST CO. et al.**

**BIGELOW v. KELLY et al.**

District Court, S. D. New York.
July 8, 1935.

Jacobson, Merrick, Nierman & Silbert and White & Hawxhurst, all of Chicago, Ill., and Curtis, Mallet-Prevost, Colt & Mosle, of New York City (Lewis F. Jacobson, Harold F. White, and Arthur Altschul, all of Chicago, Ill., and Eugene W. Goodwillie, of New York City, of counsel), for plaintiff.

Rosenthal, Hamill & Wormser, of Chicago, Ill., and Hines, Rearick, Dorr & Hammond, of New York City (Charles H. Hamill, of Chicago, Ill., Goldthwaite H. Dorr, and William B. Hubbell, both of New York City, and Edmund O. Belsheim, of Chicago, Ill., of counsel), for cross-complainant.

Chadbourne, Stanchfield & Levy, of New York City (George W. Whiteside, Louis G. Bissell, W. Hugh Peal, and Ralph D. Ray, all of New York City, of counsel), for defendant Commercial Nat. Bank & Trust Co.

Davies, Auerbach & Cornell, of New York City (Edward Cornell, Martin A. Schenck, Orrin G. Judd, all of New York City, of counsel), for defendant Irving Trust Co.

Davis, Polk, Wardwell, Gardiner & Reed, of New York City (John W. Davis, Porter R. Chandler, and Judson C. McLester, Jr., all of New York City, of counsel), for defendant Guaranty Trust Co. of New York.

Larkin, Rathbone & Perry, of New York City (John M. Perry, Hersey Egginton, Donald C. Muhleman, and Hovey C. Clark, all of New York City, of counsel), for defendant Central Hanover Bank & Trust Co.

White & Case, of New York City (Vermont Hatch and Adrian L. Foley, both of New York City, of counsel), for defendant, Bankers Trust Co.

Charles Neave, of New York City (Charles Neave, of New York City, Darius E. Peck, of Schenectady, N. Y., and John B. Cuningham, of New York City, of counsel), for defendant General Electric Co.

MACK, Circuit Judge.

These class suits were brought by a debenture holder of the Insull Utility Investments, Inc. (hereinafter referred to as I. U. I.), after the latter's adjudication in bankruptcy but before the appointment of the trustee, against five New York banks and the General Electric Company. Plaintiff asks, on behalf of herself and all other debenture holders and for their benefit, that stock pledged to defendants by I. U. I. as collateral to certain loans made by each of them in 1931, be returned or that the debenture holders share equally and ratably with those defendants in such securities. Each bank was sued separately; in addition thereto, a joint suit was brought against all of the banks and the General Electric Company. In the joint suit defendants are charged with a conspiracy to defraud the debenture holders, as hereinafter more fully stated. The trustee in bankruptcy, who was subsequently joined as a defendant, filed a cross-bill in each of the suits; he thereby sought the surrender of the pledged collateral for the benefit of all of the I. U. I. creditors. He did not, however, charge any fraud or conspiracy; at the hearing, it was frankly conceded that, without fraud or conspiracy, there was no basis for joint liability. By stipulation, the joint suit and the cross-bill therein are to be treated as if a separate suit and a cross-bill therein had been brought against the General Electric Company alone, if it should be held that the joint liability has not been established. By agreement, all of the suits were tried together.

I. U. I. was incorporated in December, 1928, with power "to acquire, dispose of, underwrite and deal in securities, and do a general investment business." As publicly stated by Samuel Insull, Sr., who promoted, controlled, and dominated I. U. I., before the pledges now in question were given, his object in creating it as well as a similar corporation, Corporation Securities Company, a year later, was "to form an investment company to buy and hold securities generally, but more particularly to buy and hold the securities of the several companies with which my name is associated * * * I wanted it for all time, to be interested in the properties that it has been my privilege either to create, improve or develop."

Immediately on its organization, 40,000 no par shares of preferred and over 1,000,000 such shares of common stock were issued for cash and in payment for the securities initially acquired. Subsequent additions to I. U. I.'s portfolio were obtained principally by means of extensive borrowing operations. In January, 1929, $6,000,000, 20-year 6 per cent. debentures (series A) were issued. Sixty thousand shares of prior preferred stock were also sold. Then followed a period of short-term borrowing, largely from the Continental Illinois Bank & Trust Company of Chicago. In August, 1929, 450,000 shares of no par value preferred stock (second series) were sold. In the fall of 1929, short-term borrowing was resumed on a much larger scale. Part of the proceeds of a $60,000,000 10-year 6 per cent. debenture issue (series B), floated in January, 1930, was used to repay these loans. No indenture was executed and no collateral securities were given in connection with either debenture issue.

During the remainder of 1930, resort was again had to bank loans throughout this and later periods; market conditions were such as apparently to preclude the possibility of funding this indebtedness through long-term obligations or paying it through the sale of further stock issues. If the portfolio of I. U. I. was to be kept intact, additional short-term borrowing was necessary in 1931, because of the 1930 decline in stock values, which, though interrupted by some periods of rise, continued during the winter of 1930–1931 and the spring of 1931.

As the company was already largely indebted to the Chicago banks, the officers of the company turned their attention to the New York banks, which, except for a short-term loan in 1929 from the Commercial National Bank & Trust Company, had theretofore made no loans to I. U. I., although some of them had loaned to other Insull-controlled companies. Negotiations with each of the defendant banks resulted in loans by them to I. U. I. totaling $17,000,000, made between March 14, 1931, and August 12, 1931. On December 22, 1931, $500,000 was borrowed from the General Electric Company. The details of all New York loans including renewals in whole or in part at maturity, are given in the footnote.[1] Each of the loans was secured by

---

[1] Following is a statement of transactions by defendants with I. U. I., including participations:

Bankers Trust Company: July 8, 1931, $500,000 participation in loan of $1,000,000 then made by the Harris Trust Com-

pledges of stock of Insull group companies, held in the I. U. I. portfolio, the market values of which showed substantial margins. Pursuant to the loan agreements to maintain specified margins, additional similar collateral was given to defendants from time to time, as the market value of the pledged stocks declined. At later periods, the agreed margins were not fully maintained. None of the loans has been repaid, in whole or in part, except for the two partial payments to Central Hanover, as indicated.

By the middle of December, 1931, the portfolio of I. U. I. was almost exhausted; demands for additional margin security could not be met. On December 16, Samuel Insull, Jr., came to New York and revealed this situation to the bankers. The proposal was then made by him that the New York and Chicago banks join in a standstill agreement intended to freeze the situation and to prevent dumping of the collateral on the market. By the terms of the proposed agreement, each bank was to receive a collateral note signed both by I. U. I. and Insull Son & Co., Inc., its wholly-owned subsidiary, bearing 5 per cent. interest. The securities then held by each bank were to remain with it, but the right to demand additional collateral was to be released and no demand for payment of the notes was to be made prior to June 15, 1932, the ultimate maturity date, without the consent of banks holding the majority in number and amount of the notes. If the banks accepted these terms, I. U. I. was not to pledge or assign any of its free assets as security for any of the existing or new indebtedness, and was thereafter to allocate its bank deposits among the signatory banks in proportion to the amount of their loans. The agreement was to become effective only on obtaining the signatures of each of the ten creditor banks. Seven of them, including two of defendants herein, signed the agreement before January 1, 1932; Central Hanover signed early in January, but later withdrew its signature; Irving signed in the latter part of March, but did not deliver the signed agreement until April; Commercial never signed. Although the standstill agreement did not, therefore, become legally binding, defendants did in fact freeze the situation in substantial compliance with its terms. With their consent, the January 1, 1932, interest on the debentures was duly paid by I. U. I.

On April 16, 1932, creditors' bill in equity and petition in bankruptcy were filed against I. U. I.; it was adjudicated bankrupt on September 22, 1932. The property was administered by an equity receiver from April until September, and by a bankruptcy receiver from September until March, 1933, when the trustee in bankruptcy was appointed. In an ancillary proceeding in bankruptcy in this district, the banks, on petition of the ancillary receiver, were restrained from realizing on their collateral until 30 days after the appointment of a trustee. After the appointment of the trustee, that proceeding was discontinued, but, by agreement of all parties, 10 days' notice of an intention to sell was to be given before a sale. None of the collateral has been sold.

Plaintiff and cross-plaintiff base the sep-

pany of Chicago at 4 per cent., due November 9, 1931, renewed November 9, 1931, at 5 per cent., due February 9, 1932. On April 12, 1932. I. U. I. delivered to Bankers Trust Company in place of the participation a demand note at 5 per cent. for $500,000, dated as of February 9, 1932, payable directly to Bankers.

Central Hanover Bank & Trust Company: June 24, 1931, $5,000,000, at 4 per cent., due September 24, 1931. On September 24, 1931, a partial cash payment of $1,000,000 was made and Central Hanover renewed the note at 4 per cent. for $4,000,000, due December 24, 1931. On December 24, 1931, another partial cash payment of $500,000 was made and the note renewed for $3,500,000, at 4½ per cent., payable on demand.

Commercial National Bank & Trust Company: First loan, December 3, 1929, $1,500,000 at 6 per cent., payable on demand paid in full January 20, 1930. Second loan, March 14, 1931, $1,500,000, at 4 per cent., due September 14, 1931, renewed on September 14. 1931, for six months at same rate.

Guaranty Trust Company: May 28, 1931, $5,000,000, at 4 per cent.. due November 30, 1931, renewed on November 30, 1931, at 5 per cent., due February 27, 1932.

Irving Trust Company: First loan, May 15, 1931, $1,000,000, at 3½ per cent., due November 16, 1931, renewed November 16, 1931, at 5 per cent., due May 16, 1932. Second loan, August 12, 1931, $4,000,000, at 3½ per cent., due February 10, 1932, interest increased to 5 per cent. on February 1, 1932.

General Electric Company: December 22, 1931, $500,000, at 5 per cent., due June 22, 1932.

arate suits against each defendant on the charge that the defendant therein made and renewed the loan and received and held the original and the subsequent collateral as security therefor, with knowledge or charged with notice that each of the transactions was in violation of one or both of the two restrictive covenants (hereinafter called the "negative pledge clause" [2] and the "50 per cent. clause" [3]), contained in the I. U. I. debentures.[4] Series B debentures contained both covenants in. full; series A debentures had the negative pledge clause, but only that part of the 50 per cent. clause relating to repurchase and redemption of I. U. I. stock.

Immediately following the covenants, there is, in each debenture of each series, a clause that: "If default be made in the payment of any installment of interest hereon * * * or in the due observance of the foregoing covenants of the Company and any such default shall continue for a period of sixty days, then at the election of the holder hereof, the principal of this debenture together with the accrued and unpaid interest hereon, shall at once become due and payable. * * *" The covenants were printed on each debenture. No debenture was filed for record as a chattel mortgage or otherwise, either in Illinois or in New York.

Each defendant denies that it had actual knowledge or is chargeable with notice [5] of the existence and/or text of the restrictive covenants. While contending

---

[2] The negative pledge clause reads: "The Company hereby covenants and agrees with the holder hereof that so long as this debenture shall be outstanding and provision for the payment thereof shall not have been made it will not mortgage or pledge any of its property unless the instrument creating such mortgage or pledge shall provide that this debenture shall be secured thereby equally and ratably with all other obligations issued or to be issued thereunder, except that the company without so securing this debenture (a) may at any time mortgage or pledge any of its property for the purpose of securing loans to the Company contracted in the usual course of business for periods not exceeding one year, and (b) may, in order to secure the purchase price or part thereof of any property which it may hereafter acquire, mortgage or pledge any or all of such acquired property."

[3] The 50 per cent. clause, following immediately after the negative pledge clause, reads: "The Company further covenants and agrees that so long as this debenture is outstanding (a) it will neither pay cash dividends on its common stock, nor redeem or purchase its capital stock of any class, in whole or in part if thereby the value of the assets of the Company will be reduced below 150% of all its indebtedness then outstanding, and (b) it will not create or assume any additional indebtedness if as a result thereof its total indebtedness will exceed 50% of the then value of its assets. The value of its assets shall be the value determined by an accountant or firm of accountants who shall be selected by the Company and be approved by the Registrar."

[4] It is conceded that the loan made by and the pledge of stock to the Commercial National Bank & Trust Company on March 14, 1931, were not a violation of the 50 per cent. clause; the transaction is, however, alleged to have been a violation of the negative pledge clause. The renewal of this loan on September 14, 1931, and the retention of the collateral previously pledged are alleged to have been in violation of both covenants.

[5] Knowledge is sought to be imputed and notice charged to defendants in many ways. Moody's and other statistical manuals to which all of the banks admittedly subscribed and which some, at least, of the bankers consulted before making the loans here attacked, contained descriptions of the debentures and of their terms. It was also established at the trial that annual statements of I. U. I., revealing the existence, though not the terms of the debentures, were in the credit files of each of the banks prior to the loans, and were consulted by most of the loaning officers. Plaintiff and cross-plaintiff urge that, due to the prevalence of restrictive covenants in debenture issues, knowledge that there are outstanding debentures puts defendants on inquiry as to whether there are restrictive covenants therein, and, if so, what the terms thereof are. It is further contended that where, as in the case of most of the banks, I. U. I. debentures were held by a bank in one or more trust accounts or as collateral for one or more brokers' loans, prior to making or renewing any loan here in question, the bank is chargeable with knowledge of the debentures and of their terms at the time of the loan transaction; further, that knowledge of subordinate loan department bank officials and of certain officials in other departments of the bank or of a wholly-owned company, actually managed in close connection with the bank, should be imputed to the bank.

Only one of the witnesses called by

that under a proper interpretation of the covenants, neither the loan nor the pledge transactions constituted a breach thereof, it alleges that, in any event, it had no actual knowledge and is not chargeable with notice of any such breach. Each defendant further contends that even if any of the transactions had constituted a breach of either or both covenants and if such transaction had been made with actual knowledge that it did involve such a breach, defendant nevertheless would not be liable because it did not induce and is not charged with having induced I. U. I. to violate the covenant.

■ 1. In so far as the suits are based on alleged violations of the negative pledge clause, they must fail. That covenant fairly construed applies only to a funded debt or possibly also to unfunded long-term borrowing; it does not apply to short-term bank loans such as those here in question, whether or not they were strictly within "the usual course of business," either of I. U. I. or of companies of that character, whatever the phrase itself may mean. The language of the covenant, although in part contradictory, practically compels this construction, when it is considered in the light of the underlying purpose evidently sought to be accomplished by its inclusion in the debentures. While the intent or purpose of one party alone does not control the interpretation of an agreement, nevertheless, assent to that purpose may be assumed unless the words used are such as would normally mislead the other party in this respect. While, too, an instrument such as this, created and issued by I. U. I., is to be construed against it in case of doubt or ambiguity, nevertheless, it is to be fairly construed in the light of its context and of all of the surrounding circumstances.

Debenture issues in this country are of comparatively recent use. While most commonly employed by industrial corporations, public utility holding companies and other investment and finance corporations have in recent years employed them to an increasing extent. Naturally, the restrictive covenants are more commonly found in in-

dustrial issues; covenants of the same general type as those now in question appear very frequently if not usually in such issues. They can be best understood in the light of their origin. Apart from moneys secured through capital stock issues, a growing industrial corporation would ordinarily have two financial needs; additional quasi permanent capital, and additional moneys for the ordinary and usual corporate expenses. Unless the capital stock itself can be increased, the first need must be met by long-term borrowing, and, from the standpoint of the borrower, best by unsecured debentures. One who is willing to risk his money in that kind of an investment would naturally, however, desire protection against later long-term lenders acquiring a more favorable position in respect to the company than he enjoys. A covenant somewhat like the negative pledge clause, although preferably affirmative rather than negative, would meet this need. Its aim would be to secure to these original long-time investors a position at least equal to that of later similar investors.

It would, however, ordinarily be as much to the interest of such investors as to that of stockholders that the company be not hindered in meeting its ordinary short-time needs through short-term bank loans which from time to time might require the giving of mortgages or pledges. Any danger of overborrowing could be met by a covenant like or analogous to the 50 per cent. clause; better, however, by a clearer and more definite provision designed not merely to prevent the incurring of liabilities beyond a certain percentage of the assets, but to compel the maintenance of quick or of all assets at a certain percentage of current or of all liabilities.

The needs of I. U. I. in order to carry out even the announced purposes of Samuel Insull, while not entirely like that of a growing industrial corporation, were nevertheless analogous thereto. Wisely or unwisely, its fundamental aim was to secure a very definite hold, amounting in hopes at least to control, of a number of other companies in the Insull group. Its assets were

plaintiff and cross-plaintiff, was asked on direct examination whether he knew of the existence of the restrictive covenants at the time that a defendant for which he had acted made its loan; his answer was in the negative. Most of the other bankers were asked, on cross-examination, whether they had such knowledge at the time of the respective loans and renewals made by them, and all of them, except McGee of the Bankers Trust, asserted that they had no such knowledge. McGee testified that he had no such knowledge at the time of the original advance made by Bankers Trust, but that he learned about the covenants prior to the date of renewal.

504

increased in its first year from nearly $19,-000,000 to nearly $108,000,000. At the close of that year it had outstanding notes of about $29,000,000 and purchase contract obligations of nearly $21,000,000. While it may well be that it had definite commitments, when it made the heavy short-time borrowings in the fall of 1929, for the distribution of the $60,000,000 series B debentures, the evidence does not affirmatively establish this. It was, however, able to meet these liabilities from the moneys received on the sale of the debentures and to have a considerable cash surplus.

While the fundamental purpose of the company was not that of a trading corporation generally in stocks or bonds or even in those of the Insull group, nevertheless, purchasers of the debentures could have known that it might well continue to obtain or to increase its control over Insull group operating and other holding companies, and that from time to time, in carrying out this purpose, it might well become necessary to make temporary loans even though, because of market conditions, it might not at the time be able to provide for refunding them through long-term issues or the sale of additional stock. It could, however, fairly hope to meet such short-term obligations by the sale from time to time of what it might consider the least desirable securities in its portfolio, if its current income should prove insufficient for the purpose or any hopes of refunding should prove illusive.

Whether short-term obligations issued for such purposes be deemed to have been made "in the usual course of business," I need not now determine. I point out this situation only to indicate the difference between long-term funded debts and short-term loans as bearing on the fair construction of the prohibition against pledges without equal and ratable protection to the debenture holders.

By the negative pledge clause, I. U. I. agrees, not to mortgage or pledge any of its assets "unless *the instrument creating* the mortgage or pledge" provides for equal and ratable security to the debenture holders with *"obligations issued or to be issued thereunder."* These words appear clearly to refer to the creation of a funded debt secured by a mortgage or trust instrument, even though the language, as applied to a pledge, is not strictly accurate in assuming that the instrument itself rather than a delivery pursuant thereto creates the pledge. The promissory notes evidencing the loans here in question contained the usual collateral security clauses, but assuredly they were not "instruments creating the mortgage or pledge" in any sense which contemplated "other obligations * * * to be issued thereunder." The only possible doubt is raised by characterizing the clause exempting loans made "in the usual course of business for periods not exceeding one year," as an "exception." Such a loan could not be an "exception" to a class in which it is not included. The possible doubt, however, is, in my judgment, readily and properly resolved by treating this so-called exception as an additional prohibition inserted out of an abundance of caution. The general tenor of the covenant clearly rejects the negative implication that might otherwise be drawn therefrom that pledges to secure short-term loans, not made in the usual course of business, are prohibited unless the debenture holders are to share in the benefit of such pledges equally and ratably with the lender.

The conclusion reached is supported by a consideration of the practical effect of the covenant under the interpretation for which plaintiff and cross-plaintiff contend. If, for example, I. U. I.'s liabilities were 30 per cent. of its assets, but these assets were temporarily frozen at a time when it found it highly desirable to increase its holdings in one of the group enterprises so as to obtain actual control, it would be prohibited, under that interpretation, from obtaining a short-term secured bank loan of say $1,000,000 without providing for the $66,000,000 debentures equal and ratable participation in the securities offered to the bank. Surely such protection, beyond the apparent needs at the time, practically preventing the deal, should not be held to be within the covenant unless the language or the context in the light of the history and purpose of the covenant fairly requires that construction. The 50 per cent. or some like clause would cover the situation if the company is in a weaker position.

2. I come then to a consideration of the 50 per cent. clause. As this covenant is drawn, it must be held not to cover loans, the proceeds of which were promptly used to cancel existing indebtedness or to cover renewals of any loans.

No "additional indebtedness" is "created" or "assumed" by the renewal of a loan; those phrases, taken together, connote extension in amount, not extension in time.

The obvious purpose of the covenant was to prevent an increase in I. U. I.'s total liabilities, not to prevent postponement of the payment of an old liability. See City of Poughkeepsie v. Quintard, 136 N. Y. 275, 32 N. E. 764 (1892). If a renewal be considered, as clearly it should be, merely the extension in time of the old debt, it would not come within the prohibition. And even if considered as the creation of a new debt, it would not be the "creation" or "assumption" of "additional indebtedness" if, at the very time the new debt is created, the old debt is pro tanto extinguished; the total amount of the indebtedness would not have varied. Cf. Powell v. Blair, 133 Pa. 550, 19 A. 559 (1890); Opinion of the Justices (In re State Bonds), 81 Me. 602, 18 A. 291 (1889); Citrus Growers' Development Ass'n, Inc., v. Salt River Valley Water Users' Ass'n, 34 Ariz. 105, 268 P. 773 (1928); see Blackburn Building Society v. Cunliffe, Brooks & Co., 22 Ch. Div. 61 (1882); City of Huron v. Second Ward Savings Bank, 86 F. 272, 49 L. R. A. 534 (C. C. A. 8th 1898). That the interest rates were increased in consideration of the renewals is immaterial; the covenant relates to the creation and not to the cost of carrying the principal of the indebtedness.

■ Cross-plaintiff stresses the word "exceed" as an inactive verb, and contends that no indebtedness additional to that of the debentures may be permitted to continue unpaid or at any rate that an obligation may not be renewed at maturity, without breach of the covenant, if at such time liabilities are in excess of 50 per cent. of the assets. Surely more appropriate language could and would have been used if this was the purpose of the covenant. I cannot, however, interpret a prohibition to *"create * * * any additional* indebtedness if as a *result* thereof, its total indebtedness will exceed 50% of the then value of its assets" into a prohibition to permit any indebtedness additional to that of the debentures, although created without violation of any covenant, to remain unpaid whenever the total indebtedness exceeds 50 per cent. of the assets or into a prohibition to renew any such indebtedness at maturity under like circumstances.

■ The same considerations apply to the Guaranty Trust loan, the proceeds of which were used to repay an existing indebtedness. The cases above cited support the broad proposition that the issuance of bonds to refund a previous bond issue does not constitute an increase of indebtedness within the prohibition of constitutional or charter limitations on the total amount of indebtedness of municipalities or private corporations or associations, even though a short period of time may elapse between the issuance of the new bonds and the retirement of the old bonds, during which period there would be a purely temporary increase in the debt. Treating this as merely incidental to the refunding operation, these cases hold the refunding bonds not invalidated by the limitation provision.

In Doon Township v. Cummins, 142 U. S. 366, 12 S. Ct. 220, 35 L. Ed. 1044 (1892), on which plaintiff and cross-plaintiff rely, the court was confronted by an unusual situation. The Iowa Constitution (Const. 1857, art. 11, § 3) provided that no political or municipal corporation "shall be allowed to become indebted, *in any manner, or for any purpose*" beyond a certain amount. (Italics mine.) The majority of the court, stressing the italicized words, held that the prohibition embraced all increases of indebtedness, whether temporary or otherwise, and regardless of the result sought to be accomplished thereby. Of the $25,000 received from the sale of the refunding bonds, less than $6,000 was applied to the retirement of the existing bonded indebtedness; the remainder being used for various unauthorized purposes. Under the constitutional limitation, the maximum permissible debt was less than $6,600. The case illustrates the danger to the credit of municipal corporations, due to the dishonesty or inefficiency of their officers, which might result from a more liberal interpretation of the constitutional provision. It is to be noted, too, that the court was applying what it deemed to be Iowa law, and was not adopting any general rule of interpretation either of Constitutions or of contracts. Furthermore, in that case, the sole question was whether or not the bonds were a nullity; here, the indebtedness, evidenced by the notes, is concededly valid as between I. U. I. and the lenders. The Doon Township Case has not been cited or referred to by the Supreme Court since it was decided; it has frequently been criticized and but rarely followed. See, e. g., City of Huron v. Second Ward Savings Bank, supra; City of Pierre v. Dunscomb, 106 F. 611 (C. C. A. 8th, 1901).

In the present case, we are concerned with a contractual, not a constitutional,

prohibition. Debts incurred in violation of the covenant are none the less binding obligations of the company, even though by their creation it has broken its contracts with the debenture holders, whereas debts incurred in violation of the constitutional limitation are void. No question of protecting the company against the dishonesty or inefficiency of its officers is involved in the instant cases. The sole purpose of this debenture covenant was to prevent any real increase in I. U. I.'s liabilities beyond the 50 per cent. of assets, because that eventually might injure the debenture holders. A loan made for the purpose of repaying and the proceeds of which are actually used to repay an existing indebtedness is held by the weight of authority not to increase the liabilities of the obligor in any real sense, even though repayment is delayed for a day or two. I need not, however, determine whether the majority or minority view is sound. Assuming that the covenant would be broken because of the possibility of a day's interval, assuming, further, that, if broken, the 60-day period to make good a default would be inapplicable so that the acceleration clause would be available to debenture holders, the question to be considered is whether or not equity would have intervened to enjoin the consummation of such a loan. In the Doon Township Case, supra, the court drew a sharp distinction between the direct exchange of a new bond for the old and the sale of new bonds for the purpose of redeeming the old. It said that a direct exchange might not be a violation of the prohibition; it held, however, that because the debt there was temporarily increased, the bonds were void. Surely, however, from any realistic point of view, a court of equity, if it assumed jurisdiction, would not grant an injunction against making a loan if the lender and borrower, instead of having the money paid to the latter and thus subjecting it to the danger of misapplication, were ready to have the lender pay it directly to the old creditor in pro tanto cancellation of, or in exchange for, the existing debt. And when that very result has been achieved, not, it is true, in the manner that equity would cautiously have required but through payment by the lender to the borrower and by the borrower to the prior creditor, there is no ground for equi-table intervention to overturn the transaction.

3. This interpretation of the covenants disposes of the suits against the Guaranty Trust Company and the Commercial National Bank & Trust Company. The $5,000,000 loan from the Guaranty Trust was negotiated for the express purpose of securing money to be used towards repaying a $12,000,000 debt to the Middle West Utilities Company which became due on May 28, 1931. Whether this purpose was revealed to the loaning officers of the Guaranty was not shown. It does appear, however, that the proceeds of the loan were transmitted to I. U. I. in Chicago on May 28th through the agency of Halsey, Stuart & Co., and were deposited by I. U. I. in its account at the First National Bank of Chicago on the same day. Likewise, on the same day, a check for the full amount of the proceeds was drawn on that bank by I. U. I. payable to the order and delivered to the Middle West. At the time of the deposit in and withdrawal from I. U. I.'s account in the First National, the company had a balance there of $510,126.15. The only other payments made into or out of this account during the month of May, 1931, were a withdrawal of $16,666.67 on May 27th and a deposit of $412.60 on May 29th. It clearly appears, therefore, that the loan was part of a refinancing operation and under the principle hereinabove discussed, creates no liability under the 50 per cent. clause. While, for some purposes, withdrawal of less than all the moneys in a bank account is presumed to be a withdrawal of those funds first deposited, this has no application where, as here, the intent of the depositor in making both the payment into and the withdrawal from the account is clearly shown.

Concededly, the original loan made by and the pledge of stock to the Commercial National Bank were not in violation of the 50 per cent. clause.

4. For the purpose of determining the liability of the remaining bank defendants, the Bankers Trust, the Central Hanover, and the Irving, it is not now necessary to decide the validity of defendants' other contentions as to the proper interpretation of the 50 per cent. clause, advanced to support their position of nonviolation.[6] Even

---

[6] The other principal contentions of defendants on this phase of the case are: That "the usual course of business" exception contained in the negative pledge clause applies as well to the 50 per cent. clause, and that the loans came within this exception; that the 50 per cent. clause has reference only to funded debt

assuming a violation of this covenant and full knowledge thereof on the part of defendants, I can find no ground upon which either plaintiff or cross-plaintiff is entitled to recover the pledged collateral.

As is frequently the case in novel actions in equity, the various equitable doctrines and analogies invoked by plaintiff and cross-plaintiff to support their position overlap to such a large extent that they cannot readily be developed in any very definite pattern. For the purposes of this discussion, however, the cases cited will be treated as though advanced in support of four nominally separate, although in reality to a large extent interrelated, theories of liability: (1) That the issuance of the debentures created an equitable lien for the benefit of the debenture holders on all of the assets of I. U. I., whether held by the company at that time or thereafter acquired; (2) that the covenants created "something in the nature of an equitable servitude" on all such assets of I. U. I.; (3) that defendants are constructive trustees of the pledged collateral for the benefit of the debenture holders, either because they participated in a breach of trust or knowingly and unjustifiably interfered with the debenture holders' contract rights; (4) that the debenture holders had a right, enforceable in equity, to continued performance of their contract by I. U. I., and consequently now have an equitable right of reparation against those who knowingly invaded that right, even though they did not induce the breach of contract.

█ 5. The claim of an equitable lien on all of the assets of I. U. I. then held and subsequently acquired, created by the issuance of the debentures, is without foundation. This claim, as well as that of "something in the nature of an equitable servitude" is rested on the negative pledge clause, for that covenant alone purports to restrict the use of property. I have hereinabove determined that there was no violation of this restriction. But even if the negative pledge clause prohibited the pledges in question, no equitable lien can be created out of that prohibition. There was here no agreement to set aside or to hold and no appropriation or intention to appropriate any specific property or fund as collateral security for the debenture obliga-

tions, the prerequisite to the creation of an equitable lien. Cushing v. Chapman, 115 F. 237 (C. C. E. D. Mo. 1902); Addison v. Enoch, 48 App. Div. 111, 62 N. Y. S. 613 (1900), affirmed without opinion 168 N. Y. 658, 61 N. E. 1127 (1901); Gosselin Corporation v. Mario Tapparelli fu Pietro of America, Inc., 191 App. Div. 580, 181 N. Y. S. 883 (1920), affirmed without opinion 229 N. Y. 596, 129 N. E. 922; Holmes v. St. Joseph Lead Co., 84 Misc. 278, 147 N. Y. S. 104 (1914), affirmed without opinion 163 App. Div. 885, 147 N. Y. S. 1117; cf. De Winter v. Thomas, 34 App. D. C. 80, 27 L. R. A. (N. S.) 634 (1909). I do not regard Badgerow v. Manhattan Trust Co., 64 F. 931 (C. C. S. D. N. Y., 1894), as an authority against this proposition.

█ Moreover, no case has been cited or found in which a negative covenant has been held to have created an equitable lien. An agreement by an owner of property not to do certain things in respect thereto cannot be construed as giving the promisee a present interest in that property; he cannot proceed against it to satisfy the obligation. At least until threatened breach, his only right is personal against the promisor. Knott v. Shepherdstown Mfg. Co., 30 W. Va. 790, 5 S. E. 266 (1888); Western States Finance Co. v. Ruff, 108 Or. 442, 215 P. 501, 216 P. 1020 (1923). Therefore, the I. U. I. debenture covenants created only personal rights against the company, not a present security interest in its assets. Furthermore, the company at all times, whether before or after breach of the covenant, had the right while solvent to sell all of the stock in its portfolio to a purchaser with knowledge of the restrictive covenants and of their violation. That right, although not contradictory to the restrictive covenants, is inconsistent with a right to an equitable lien on the assets. It therefore compels the rejection of the equitable lien theory. See Cushing v. Chapman, supra.

Connecticut Co. v. New York, N. H. & H. R. Co., 94 Conn. 13, 107 A. 646 (1919), on which plaintiff principally relies, applies, if at all, only to the negative pledge covenant; even as so applied, however, it is distinguishable. . In that case, debenture bonds issued by a railroad company con-

---

or new debentures; that the term "value," as used in the 50 per cent. clause, refers to book and not market value, and that under this construction of the cove-

nant, there was clearly no violation thereof. They contend too that even if "value" refers to market value, the evidence did not establish a breach of contract.

tained a covenant that if the company should thereafter mortgage any of its presently-owned property except to renew existing mortgages, the debentures would participate equally in the security of such mortgage. The court held unanimously that no valid mortgage could be effected on terms which would prevent the bondholders from sharing in the security. Three of the five judges held further that the bonds created an equitable lien forthwith on the property and franchises of the company owned by it at the date of issue. The majority stressed the fact that the debentures contained an affirmative covenant rather than a "personal contract not to mortgage." Moreover, the covenant related to specific property, owned by the promisor at the time of the issuance of the debentures, and easily capable of identification. I need express no opinion as between the conflicting views on the lien question. See note (1920) 33 Harv. L. Rev. 456.

6. The contention that the covenants created "something in the nature of an equitable servitude" is also, in my judgment, unfounded, even as applied to the negative pledge covenant. While the scope of this equitable doctrine remains as yet undefined, it is clear that the vast gap between the situation presented in Tulk v. Moxhay, 2 Ph. 774 (1848) and that presented in the case at bar has not yet been bridged, if indeed it ever will be. While some courts, in a limited class of cases, have recognized equitable servitudes on chattels (see Chafee, Equitable Servitudes on Chattels (1928) 41 Harv. L. Rev. 945), apparently none has applied the doctrine to negotiable instruments or to certificates of stock, negotiable in form and effect, such as are here involved. The explanation is not far to seek. Unlike Tulk v. Moxhay, there is here no dominant tenement to which the benefit of the servitude may attach. Despite dicta to the contrary by Illinois courts (see Van Sant v. Rose, 260 Ill. 401, 103 N. E. 194, 49 L. R. A. (N. S.) 186 (1913), equity looks with disfavor on servitudes in gross, the more so when, as here, the alleged servitude would enure to the benefit of a constantly changing group of people. In respect to resale restrictions, the business of the vendor may perhaps be considered the dominant tenement (see Abergarw Brewery Co. v. Holmes, [1900] 1 Ch. 188), but even in such a case the restrictions are but rarely enforced as against subvendees. See Chafee, supra, at 979 et seq. Moreover, in the instant case

there is no specific property to which the burden of the alleged equitable servitude might attach. A floating servitude, attaching to property if and when acquired, enforced in equity as against third parties, is a completely novel conception.

Nor are stocks purchasable in the open market, as were most of those in I. U. I.'s portfolio, the unique kind of property to which equitable servitudes might normally attach. Tulk v. Moxhay, supra; cf. McMurray v. Moran, 134 U. S. 150, 10 S. Ct. 427, 33 L. Ed. 814 (1890) (restriction against issuance of additional bonds secured by a mortgage on railroad property); Montgomery Enterprises v. Empire Theater Co., 204 Ala. 566, 86 So. 880, 19 A. L. R. 987 (1920) ("first-run" motion pictures); Murphy v. Christian Press Association Publishing Co., 38 App. Div. 426, 56 N. Y. S. 597 (1899) (electrotype plates for a copyrighted book); Phonograph Co. v. Menck, [1911] A. C. 336 (patented phonographs and records).

The citation of such cases as In re Waterson, Berlin & Snyder Co., 48 F.(2d) 704 (C. C. A. 2d 1931); Great Lakes & St. L. T. Co. v. Scranton Coal Co., 239 F. 603 (C. C. A. 7th 1917); Lord Strathcona Steamship Co. v. Dominion Coal Co., [1926] A. C. 108; Wederman v. Societe Generale d'Electricite, 19 Ch. Div. 246 (1881), and DeMattos v. Gibson, 4 De G. & J. 276 (1858), indicates, however, that the contention of cross-plaintiff is not that the covenants create an equitable servitude, strictly speaking, but that they create some kind of an equitable right, enforcement of which would have much the same result as would enforcement of an equitable servitude. The decisions cited are, for the most part, cases involving the right to specific performance against transferees of property who took with knowledge that the transferor thereof was under obligation to convey the property to or use it for the benefit of another. The reasoning on which such relief is granted is that the right to specific performance of a contract, because of inadequacy of the remedy at law, is an equitable right in the property to which the contract relates, a right which is not cut off by a transfer of the property to a third party who has notice of the promisee's equity. As so limited, the contention that the covenants create "something in the nature of an equitable servitude" is but a corollary of the fourth proposition, that the debenture holders had a right to enjoin I. U. I. from borrowing

from and pledging collateral to defendants, and that they therefore now have an equitable interest in the wrongfully pledged stock, enforceable against defendants, assuming that the latter took the collateral with knowledge of the contract. The right to enjoin a breach of a negative covenant and the right to specific performance of an affirmative promise are but two incidents of one basic right, enforceable in equity, that to performance of a contract, for the breach of which an action at law for damages would be an inadequate remedy. Therefore, the applicability to the situation now before the court of the cases cited in support of both propositions, i. e., that the right to specific performance of an affirmative promise and the right to enjoin breach of a negative covenant, create equitable interests in the property to which they relate, may best be considered together in relation to the fourth theory of liability.

■ 7. Analogies from the law of trusts, upon which plaintiff and cross-plaintiff also rely, do not advance their cause. The argument is made that, because no trust indenture was executed in connection with the debentures, the company itself is in the position of a trustee for the debentureholders. The cases cited[7] do not support this novel theory. There was no res to which a trust might have attached; clearly all the assets of I. U. I. were not intended to be held in trust for the benefit of the debenture holders. I. U. I. neither intended to nor could it be a trustee for the debenture holders of its own promises to them. It follows that the banks cannot be held liable as knowing participants in a breach of trust.[8]

Kaplan v. Chase Nat. Bank, 156 Misc. 471, 281 N. Y. S. 825, applies only to the negative pledge clause, but even as so applied, it is clearly distinguishable. The defendant in that case was the trustee under a trust indenture securing an issue of debenture bonds, which contained a covenant that the company would not create any lien on or pledge of the stock of its subsidiaries without ratably securing the debentures. The trustee, defendant, which loaned money to the company and received stock of its subsidiaries as collateral without any provision for ratably securing the debentures, was ordered, in the suit by debenture holders, to treat the pledged collateral as though such a provision had been made. The defendant in that case, unlike defendants in the case at bar, was an express trustee for the benefit of the debenture holders; in such a situation, the beneficiaries clearly have a right of action against the trustee for the violation of its fiduciary duty to them.

■ Plaintiff and cross-plaintiff also seek to charge defendants as constructive trustees on the theory that receipt of property with knowledge that the transfer is in violation of a contractual obligation creates a liability in equity in favor of the obligee. But the cases do not support this broad proposition. Angle v. Chicago, St. Paul, etc., Ry. Co., 151 U. S. 1, 25, 14 S. Ct. 240,

---

[7] Jackson v. Ludeling, 21 Wall. (88 U. S.) 616, 22 L. Ed. 492 (1874), Virginia-Carolina Chemical Co. v. Ehrich, 230 F. 1005 (D. C. E. D. S. C. 1916), Whitford v. Moehlenpoh, 196 Wis. 10, 219 N. W. 361 (1928), and Lynch v. Conger, 181 App. Div. 221, 168 N. Y. S. 853 (1917), affirmed without opinion 229 N. Y. 543, 129 N. E. 908 (1920), were actions against officers or directors of corporations for violation of their duties; they recognize that, for some purposes and in some situations, the officers and directors stand in a fiduciary relation to creditors as well as to stockholders. They are not, however, authority for the proposition that every corporate promise is a trust res, of which the corporation is trustee. In National Surety Co. v. Manhattan Mortgage Co., 185 App. Div. 733, 174 N. Y. S. 9 (1919), and Keating v. Hammerstein, 125 Misc. 334, 209 N. Y. S. 769 (1921), the liability of the defendants was based on their participation, with knowledge, in a diversion of trust funds. The defendant in Blakeslee v. Santo Sottile, 118 Misc. 513, 194 N. Y. S. 752 (1922) was held liable for violation of his duty as trustee of an express trust.

[8] All of the cases cited to support the contention that the banks are liable as participants in a breach of trust involve interference with the rights of a beneficiary under an express trust. Geyser-Marion Gold-Min. Co. v. Stark, 106 F. 558, 53 L. R. A. 684 (C. C. A. 8th 1901); Henshaw v. State Bank, 239 Ill. 515, 88 N. E. 214, 130 Am. St. Rep. 241 (1909); Owens v. Nagel, 334 Ill. 96, 165 N. E. 165 (1929); Loring v. Brodie, 134 Mass. 453 (1883); Moore v. American Loan & Trust Co., 115 N. Y. 65, 21 N. E. 681 (1889); First Nat. Bank of Paterson v. National Broadway Bank 156 N. Y. 459, 51 N. E. 398, 42 L. R. A. 139 (1898); Guaranty Trust Co. of New York v. Atlantic Coast Electric R. Co., 138 F. 517 (C. C. A. 3d 1905).

38 L. Ed. 55 (1894) is not in point. All that it holds is that where A, *by fraudulent means, induces* B to break his contract with C, as a result of which A obtains property which would otherwise have gone to C, A holds that property in constructive trust for C. No such case is before me; defendants are charged neither with actual fraud nor with inducing a breach of contract.

The other cases cited on this point[9] illustrate the principle, already noted in relation to the doctrine of equitable servitudes, that one having a contract right which is specifically enforceable against the promisor because recognized in equity as unique may secure specific enforcement thereof against a transferee of the property, taking with notice of the contract relating thereto. The contention that the banks are constructive trustees, when narrowed to the principle of these cases, is essentially the same as the contention that the debenture covenants created "something in the nature of an equitable servitude"; and both are but corollaries of the fourth, and principal, theory of liability.

8. The premise of this fourth proposition, as hereinabove stated, is that the debenture holders had a right to enjoin both the making and the renewal of each loan and the pledging and the retention of the collateral, because such act would involve breaches of both clauses; the conclusion sought to be drawn therefrom, is that the debenture holders, after such a breach of either covenant, acquired something in the nature of an equitable lien on the wrongfully pledged certificates of stock, enforceable against the defendants, on the assumption that they had knowledge of or are chargeable with notice of the debenture holders' rights.

The fundamental question to be considered in this connection is whether the acceleration provision in the debentures gave the holders thereof such an adequate remedy at law for breach of the covenants as to preclude equitable jurisdiction. Although in a few cases there are statements to the contrary (Donnell v. Bennett, 22 Ch. Div. 835 (1883); American Sand & Gravel Co. v. Chicago Gravel Co., 184 Ill. App. 509 (1914); Van Sant v. Rose, supra; but cf. Brand v. Svenson, 170 Ill. App. 54 (1912), the general rule is that an injunction against breach of a negative covenant will not issue unless the remedy therefor at law is inadequate. Cf. Javierre v. Central Altagracia, 217 U. S. 502, 30 S. Ct. 598, 54 L. Ed. 859 (1910).[10]

At the time of the original loans by these defendant banks, I. U. I. was abundantly solvent; therefore, if a debenture holder had known of any violation, he could have recovered at law the full amount of the debentures, certainly a perfectly adequate remedy. Whether the provision in the debentures that the principal thereof might be accelerated only on continuance of default for 60 days is applicable to such breaches of covenant as are charged in this case is questionable. Logically, this provision would seem to have reference only to defaults curable within the 60-day period, and violations of negative covenants are not, strictly speaking, curable, although it may frequently be possible to repair the

9 Ross v. Parks, 93 Ala. 153, 8 So. 368, 11 L. R. A. 148, 30 Am. St. Rep. 47 (1890); Horgan v. Russell, 24 N. D. 490, 140 N. W. 99, 43 L. R. A. (N. S.) 1150 (1913); Plains Iron Works Co. v. Haggott, 72 Colo. 228, 210 P. 696 (1922); Detroit Lubricator Co. v. Lavigne, 151 Mich. 650, 115 N. W. 988 (1908); People's Natural Gas Co. v. American Nat. Gas Co., 233 Pa. 569, 82 A. 935 (1912); Smurr v. Kamen, 301 Ill. 179, 133 N. E. 715, 22 A. L. R. 1023 (1922); Smith v. Smith, 340 Ill. 34, 172 N. E. 32 (1930); Great Lakes & St. L. T. Co. v. Scranton Coal Co., supra; Meyer v. Washington Times Co., 64 App. D. C. 218, 76 F. (2d) 988 (1935).

10 In all of the cases cited by plaintiff and cross-plaintiff in which a court of equity enjoined a breach either of an express or of an implied negative covenant, the remedy at law was clearly inadequate. See, e. g., Alcazar Amusement Co. v. Mudd & Colley Amusement Co., 204 Ala. 509, 86 So. 209 (1920); Fleckenstein Bros. Co. v. Fleckenstein, 66 N. J. Eq. 252, 57 A. 1025 (1904); Booth & Co. v. Seibold, 37 Misc. 101, 74 N. Y. S. 776 (1902); National Linen Service Corporation v. Clower, 179 Ga. 136, 175 S. E. 460 (1934); E. L. Husting Co. v. Coca Cola Co., 205 Wis. 356, 237 N. W. 85, 238 N. W. 626, 84 A. L. R. 22 (1931), certiorari denied Wisconsin Coca Cola Bottling Co. v. E. L. Husting Co., 285 U. S. 538, 52 S. Ct. 311, 76 L. Ed. 931; P. Lorillard Co. v. Weingarden, 280 F. 238 (D. C. W. D. N. Y. 1922); cf. New York Phonograph Co. v. Jones, 123 F. 197 (C. C. S. D. N. Y. 1903); Meyer v. Washington Times Co., supra.

damage that may be caused by such a breach.

■ However, even if the debenture holders would have had to wait 60 days before bringing an action at law for the face amount of the debt, this would not, of itself, have made the legal remedy inadequate, unless at least some likelihood of insolvency occurring within the 60-day period were shown; this was not the situation at the time of the original loans.

The cases cited by plaintiff and cross-plaintiff to support their contention that the debenture holders would have had a right to enjoin the loan transactions are not applicable to the present situation. Stewart v. Griffith, 217 U. S. 323, 30 S. Ct. 528, 54 L. Ed. 782, 19 Ann. Cas. 639 (1910) and Shannon v. Cavanaugh, 12 Cal. App. 434, 107 P. 574 (1910) are not authorities for the proposition that the acceleration provision did not give an adequate remedy at law. In Stewart v. Griffith, an agreement for the sale of land provided for a $500 down payment on the full purchase price, to be forfeited in case of default in the payment, when due, of the remainder of the first half of the purchase price. The court held that this agreement did not preclude the vendor from securing specific performance of its contract. The provision for the $500 forfeiture was, in the most favorable view, a provision for the liquidation of unascertainable damages; it did not purport to give the vendor complete reparation, but was merely a condition of his further performance, to be insisted upon or waived at his election. The acceleration provision in the present case, on the other hand, did give the debenture holders the opportunity for complete reparation; if it were properly exercised, they would recover 100 cents on the dollar. Shannon v. Cavanaugh, supra, was a suit brought by a lessor for specific performance of a lease, which contained a covenant that in case of default the lessor might terminate the lease and re-enter. In granting the decree prayed for, the court pointed out that, under the law of California, adequacy of legal remedy is no defense to an action for specific performance; moreover, that the legal remedy was not adequate, because the extent of the plaintiff's injury was unascertainable. Termination and re-entry was held not to be an adequate substitute for performance since it would deprive the lessor of contractual rights recognized in equity as unique.

No such situation is presented in the instant cases. While the provision for acceleration of maturity does not purport to be and is not the only remedy of the debenture holder for breach of a covenant, on the other hand, his optional right not to mature the debt and the correlative right to continue the loan at the agreed rate until its stated maturity, have no such element of uniqueness as would induce a court of equity to take jurisdiction and to enjoin a breach of the covenant. Clearly, equity would deem his right to accelerate and then to recover his debt at law an adequate remedy.

In Chase National Bank v. Sweezy, 156 Misc. 6, 281 N. Y. S. 487, a company had issued debentures under a trust indenture providing that, so long as the debentures remained outstanding, the company would not mortgage or pledge any of its property to secure any new indebtedness of any sort unless the debentures were equally and ratably secured. No provision was made for acceleration of the principal in the event of violation. The trustee under the indenture subsequently loaned money to the company and received a portion of its assets as security therefor. The debenture holders were held entitled to share in the security on the ground that they could have enjoined the loan and pledge and that they therefore had an equitable lien on the pledged property as against the trustee, which was held to have had actual knowledge of the terms of the indenture. Since there was no provision for acceleration of principal, the debenture holders clearly had no adequate remedy at law for the violation of the covenant. Moreover, the lender in that case was an express trustee for the benefit of the debenture holders, and was for that reason, if for no other, liable for violation of its fiduciary duty to them.

■ The conclusion that the debenture holders would have had no right to enjoin the consummation of the loans made by defendant banks is decisive of the present suits against them. If the making of the loans gave the debenture holders no legal or equitable rights against the banks, the subsequent insolvency of I. U. I. did not create such rights. It would be a novel doctrine that a breach of contract, causing no irreparable injury at the time, is yet cognizable in equity because the subsequent insolvency of the promisor robs the promisee of the practical value of his remedy at

law. Since there is no legal liability of defendant banks because none of them induced I. U. I.'s alleged breach of covenant and no equitable jurisdiction because the legal remedy against I. U. I. was adequate, the bills and cross-bills brought against them must be dismissed.

9. The situation as to the General Electric loan is in some respects different from that as to any of the others. As to a part, at least, it is somewhat similar to the Guaranty Trust transaction. Samuel Insull, Sr., stated to Gerard Swope, president of General Electric, that loans aggregating $2,000,000, of which the $500,000 to I. U. I. was a part, the balance going to two other Insull companies, were needed in order' to reduce some of the outstanding bank indebtedness. On December 22, 1931, General Electric made its secured loan of $500,000 to I. U. I., guaranteed by Insull personally, and, at Insull's request, gave its two checks, dated December 21, 1931, payable to I. U. I.; one for $260,-000, and the other for $240,000. On December 22, the larger check was indorsed to the order of the Central Hanover and deposited in I. U. I.'s account in that bank. On that date, the balance in the account before the deposit was $387,511.-75. The Central Hanover loan of $4,000,-000 matured on December 24th, and, in accordance with previous arrangements, $500,000 was on that day debited to I. U. I.'s account in the bank and the loan renewed for $3,500,000. It is, therefore, apparent that at least to the amount of $260,000, the General Electric loan, like the Guaranty loan, was in effect a refinancing operation. As such it would not then have been enjoined and so much of the collateral as is ratably apportionable to the $260,000 will not now be recoverable in a court of equity in these proceedings. For the reasons hereinabove stated in considering the Guaranty Trust loan, the two days' interval will not justify equitable relief as far as concerns the $260,000. No claim of preferential payment to Central Hanover recoverable under the Bankruptcy Act (11 USCA) is involved in these cases, and my conclusions are, therefore, without prejudice to any proceedings by the trustee on that ground.

The $240,000 check was indorsed to and deposited in the Continental Illinois Bank & Trust Company on December 22d. At that time the Continental held demand notes of I. U. I. for nearly $19,000,000.

There is no evidence, however, that the $240,000 was credited on I. U. I.'s debt to the Continental, or that any other debt of that amount or more was paid thereafter out of the deposit in the Continental. To the extent of $240,000, therefore, the General Electric loan must be considered in the same light as those by the Bankers Trust, the Central Hanover, and the Irving.

It would differ, however, from these bank loans, if I. U. I. was insolvent on December 22d or in all probability would soon become insolvent. A debenture holder, seeking on that date to enjoin the making of the loan, could certainly have established at least a strong probability of a very early insolvency. Although the authorities are in conflict on the right to equitable relief on a legal claim merely because of a promisor's insolvency (Parker v. Garrison, 61 Ill. 250; but see Williston (1906) Transfers of After Acquired Personal Property, 19 Harv. L. Rev. 557, 584-5), there are in this case sufficient additional elements to justify equitable intervention when, despite acceleration, full recovery would have been jeopardized by such actual or probable insolvency. In these circumstances, there would have been no adequate legal remedy.

The question as to the liability' of the General Electric, therefore, depends upon whether the debenture holders' right to have the consummation of the loan enjoined gives them the right, after its consummation, to have the loan transaction set aside, leaving to General Electric merely an unsecured claim against I. U. I. for money had and received. As hereinabove stated, plaintiff and cross-plaintiff urge that the right to enjoin a breach of the negative covenant, like the right to obtain specific performance of an affirmative promise, is, in effect, an equitable interest in the property to which the contract relates, enforceable against one who takes the property with notice of the equity.

There is an essential difference between an injunction against A forbidding him to execute an agreement with B which would interfere with the performance of B's promise to C, and a decree which overturns a consummated transaction, because made contrary to B's agreement with C and with full knowledge of the breach. In the first case, the only damage occasioned to A is the loss of a pos-

sible opportunity to make a profit. The injunction directed against A is, in reality, incidental to C's right against B. The process of the court is invoked against A to prevent nullification of its decree against B; C has no independent right against A enforceable in equity unless A is threatening to commit a tort by inducing B to break his contract.

On the other hand, a decree against A which overturns an executed transaction and which would, as in the present case, occasion present loss to A, must be based, on the theory that A is under some direct obligation to C enforceable by him in equity. When and how such an obligation was incurred is not clear. It cannot be on the theory applied in the St. Lawrence & Great Lakes Transportation Company, the Lord Strathcona, and similar cases, that the right to specific performance of a contract creates an equitable interest in the property to which the contract relates, enforceable against transferees of the property with notice of the promisee's equity. The 50 per cent. clause does not relate to any specific property; it did not, therefore, per se create any equitable right in the debenture holders to the securities pledged to General Electric as collateral to its loan, even though the loan was knowingly made in violation of the company's contractual duty to the debenture holders.

■ The contention of plaintiff and cross-plaintiff, therefore, goes further than any of the cases cited, unless it be that of Meyer v. Washington Times Co., supra, in which, however, the element of uniqueness was involved. They seek to have the court create a liability in equity, based on a knowing participation in, though not the inducing of a breach of contract when, for that breach, the remedy at law against the promisor is inadequate, because of its insolvency, actual or highly probable. Such noninducing interference or participation by the third party is not actionable at law as a tort. Sweeney v. Smith, 167 F. 385 (C. C. E. D. Pa. 1909), affirmed, 171 F. 645 (C. C. A. 3d 1909), certiorari denied 215 U. S. 600, 30 S. Ct. 400, 54 L. Ed. 343; Lamport v. 4175 Broadway, Inc., 6 F. Supp. 923 (D. C. S. D. N. Y. 1934). It is urged, however, that equity is not restricted by the principles of the tort action; that intentional interference with another's contractual rights, without justification therefor, is a moral wrong, and,

therefore, unless there are countervailing equitable considerations, equity should grant relief even though in so doing it establishes a higher standard of fair dealing toward strangers than has been recognized in actions at law.

Appealing as is the argument, I am not called upon to determine its validity in this case, because, unlike the Meyer Case, I find on this record that neither Swope nor Young, the two officers of General Electric who negotiated the loan, had actual knowledge that there were restrictive covenants in the debentures. Indeed, though Swope knew that there were outstanding debentures, it is not established that Young had even this knowledge prior to the consummation of the loan. There was, therefore, no *intentional* interference by General Electric with the debenture holders' contractual rights.

I need not now determine whether knowledge that there were outstanding debentures would have led an ordinarily prudent man of Swope's financial experience, though not a banker engaged regularly in transactions involving debentures, to inquire whether they contained any, and if so what, restrictive covenants. Even if an ordinarily prudent man would have made such inquiry, Swope and Young's failure so to do cannot be attributed and is not charged to be due to any intentional or willful refusal to ascertain the facts.

■ At the best, there would be a negligent interference with contractual rights which, unlike an intentional invasion thereof, does not evidence bad faith and therefore does not call for an extension of equity jurisdiction beyond that heretofore established. In all of the cases cited in which specific performance of a contract was decreed against a third person, full knowledge on the part of the defendant of the plaintiff's contractual rights was proved. In granting such relief, the courts ordinarily stress the defendant's lack of good faith. See especially Lord Strathcona Steamship Co. v. Dominion Coal Co., supra.

■ As the common law gives no right of action for damages due to a negligent interference with another's contractual rights (New York Trust Co. v. Island Oil & Transport Corporation, 34 F.(2d) 649 (C. C. A. 2d 1929); cf. Robins Dry Dock & Repair Co. v. Flint, 275 U. S. 303, 305, 48 S. Ct. 134, 72 L. Ed. 290 (1927); but

see Carpenter Interference with Contract Relations, 41 Harv. L. R. 728, 737–742), such negligence alone cannot be held to be a sufficient basis for a court of equity to give relief and thus to refuse to follow the common law.

The result reached in the General Electric case involves no injustice. The debenture holders unfortunately relied at best on the unsecured promises of the company, if indeed they actually appreciated the legal character of these debentures. Probably many, if not most of them, were led on by the then alluring name of Insull. Even the comparatively slight safeguard of a trust indenture, under which some duties might have been imposed on the trustee for their benefit, was absent. Such was the character of the instruments, miscalled securities, that they were led to buy as investments. For their misplaced reliance they must bear such consequences of the company's broken promises as cannot be made good by the company itself, unless under some principle of equity they should be borne by another. General Electric, unlike the debenture holders, was unwilling to rely on I. U. I.'s unsecured promise; it was honestly, even if it could be found to have been negligently, unaware that, in acquiring the collateral, it might be assisting the company in violating the debenture holders' contractual rights. In this situation, I can find no compelling reason for relieving the debenture holders at the expense of General Electric by depriving it of the securities accepted by it in good faith, even though pledged to it in disregard of the covenants. Cf. Stone, Rights of Cestui qui Trust, 17 Col. L. R. 467, 484, 488.

Of course, these conclusions indicate no approval of the issuance and sale to the general public of debentures which might be thought to afford but which actually fail to give any real protection to the purchasers. On the contrary, these and other practices, so freely indulged in in financial circles during the so-called era of prosperity, undoubtedly call for correction and prevention. Legislation, state and federal, is, however, essential to meet the evil. What the statutory remedies should be, I do not venture, in a judicial opinion, to consider.

10. It is unnecessary to dwell at length on the merits of the joint suit since, in so far as it may have any substance, the cause of action is not in plaintiff. The principal charge is that defendant banks conspired to delay the filing of a bankruptcy petition against I. U. I. for four months from December 16, 1931, so as to avoid the possibility that they might have to return, as preferential payments, substantial amounts of additional collateral which shortly before December 16th were pledged to them by I. U. I. in order to maintain the required margins; further, that they conspired to prevent immediate liquidation of their collateral, thereby jeopardizing or defeating debenture holders' right to participate in any excess thereof. The arrangement in the standstill agreement whereby I. U. I. agreed to deposit all future income received by it in the defendant and other creditor banks ratably in proportion to the amount of their loans and to deposit its "free assets" with the Northern Trust Company of Chicago is also attacked. The alleged domination of the banks over the affairs of I. U. I. from December 16, 1931, to April 16, 1932, is likewise charged to have been in furtherance of a conspiracy to defraud the debenture holders, although precisely in what manner is not clear. The January 1, 1932, interest payment on the debentures, made with the acquiescence of the banks, is alleged to have been part of a design to delude the debenture holders into a false sense of security. There is also a general charge that defendants conspired to induce I. U. I. to violate and to continue to violate the restrictive covenants in the debentures and thus to deprive the debenture holders of the security provided thereby.

In so far as the alleged conspiracy involves violation of the covenants, it must fail on the merits. All of defendant banks made their loans prior to December 16, 1931, the date on which the conspiracy is alleged to have commenced; no additional collateral was thereafter pledged to any of them. There is no evidence that the banks had any connection with the negotiation or execution of the General Electric loan. As hereinabove stated, defendants' failure to demand payment of the loans at their maturity was not a violation of the covenants; no liability can therefore arise because of their alleged conspiracy in effectuating the extensions.

The other allegations, if they charge any legal wrong, charge a wrong to all of I. U. I.'s creditors and not one peculiar to the debenture holders. Since the latter

had no equitable lien on the pledged stock, all of the creditors would have participated ratably in any excess of collateral returned to the company on liquidation by defendants, as well as in any collateral which the trustee in bankruptcy might have recovered as preferential payments, had bankruptcy proceedings against I. U. I. not been delayed until April 16, 1932. Likewise, the reallocation of bank deposits, the freezing of the "free assets," and defendants' alleged assumption of control over I. U. I. after December 16, 1931, if they invaded any rights at all, invaded those of all of I. U. I.'s creditors and not those of the debenture holders alone.

If there were a cause of action, it would, therefore, be in the trustee in bankruptcy as the representative of all the creditors. The trustee, however, in his cross-bill, has not asserted any cause of action at law or in equity, based on conspiracy or fraud.

In view of the conclusions reached, I have found it unnecessary to decide many interesting questions fully argued and briefed by counsel. The findings of fact and conclusions of law contained in this opinion may be taken as meeting the requirements of the equity rule, in lieu of a more formal statement thereof. They will suffice unless and until I shall be found to have erred therein.

Each of the bills and cross-bills will be dismissed on the merits at plaintiff's and cross-plaintiff's costs.

## UNITED STATES v. ONE FORD V-8 SEDAN, 1934 MODEL, etc.

### No. 1226.

District Court, E. D. Kentucky.

July 17, 1935.

Mac Swinford, Dist. Atty., of Cynthiana, Ky., for libelant.

Jacob S. Hermann, of Cincinnati, Ohio, for intervening petitioner.

FORD, District Judge.

This is a libel proceedings under section 3450 of the Revised Statutes of the United States (26 USCA §§ 1181, 1182) seeking forfeiture of a Ford V-8 sedan alleged to have been seized while being used by the owner in the unlawful removal, deposit, and concealment of distilled spirits

516

with the intent to defraud the United States of the tax imposed thereon by the Liquor Taxing Act of 1934 (48 Stat. 313).

Although Edward Crawford, the owner of the car, makes no defense, the right of forfeiture asserted by the government, under the facts alleged and stipulated, is vigorously disputed by the intervening petitioner, Lou Bauer, the holder of a chattel mortgage on the car.

On January 11, 1934, Congress passed the "Liquor Taxing Act of 1934" (48 Stat. 316, 26 USCA § 267 et seq.). This act provides, in substance, that (subject to certain exceptions not here material) no person shall possess any distilled spirits unless the immediate container thereof has affixed thereto a stamp evidencing payment of all Internal Revenue taxes imposed thereon, and it makes provision whereby a person desiring to place taxable distilled spirits into a container upon which a tax stamp is required, may purchase such stamps from the collector of internal revenue.

Section 3450 of the Revised Statutes, under which this libel proceeding is instituted, provides that every carriage or other conveyance, whatsoever, used in the removal or for the deposit and concealment of goods, removed, deposited, or concealed with the intent to defraud the United States of any tax thereon, shall be forfeited.

The case is submitted upon a stipulation of facts which discloses that on the 22d day of September, 1934, an investigator of the Alcohol Tax Unit of the Bureau of Internal Revenue, arrested Edward Crawford and, at the time of his arrest, Crawford had in his charge and possession the automobile in question in which the officer found deposited about 36 gallons of whisky, upon the immediate container of which there was affixed no stamp as required by the Liquor Taxing Act of 1934. The stipulation further shows that said Crawford was indicted by the federal grand jury at Covington on the 18th day of October, 1934, on the charge of unlawfully, willfully, and feloniously having in his possession the said distilled spirits without the immediate container having affixed thereto the required stamps in violation of the Liquor Taxing Act of 1934. On October 18th, said Crawford entered a plea of guilty to that indictment and was sentenced thereunder. The stipulation further shows that the intervening petitioner, Lou Bauer, holds a duly recorded chattel mortgage upon said automobile, as set out in his intervening petition, upon which there is a balance due and unpaid of $465, with interest, and under the terms of which the default of the mortgagor entitles the mortgagee to the possession of the property. At the time of the taking of said mortgage, the intervener had no knowledge nor any reason to believe that said automobile would be used for any unlawful purpose, and his taking of said mortgage was in good faith and for a valuable consideration.

It is now established beyond question that if a vehicle be used for the removal, deposit, or concealment of unstamped distilled spirits so as to subject it to forfeiture under section 3450 of the Revised Statutes, the interests of innocent persons in the vehicle are not saved. The statute treats the vehicle as the offender. Goldsmith, Jr.–Grant Company v. United States, 254 U. S. 505, 41 S. Ct. 189, 65 L. Ed. 376; United States v. One Ford Coupé Automobile, 272 U. S. 321, 47 S. Ct. 154, 71 L. Ed. 279, 47 A. L. R. 1025.

The intervening petitioner, however, earnestly insists that there is no showing in this case of an intent to defraud the United States of the tax within the meaning of Rev. St. § 3450.

By the plain terms of the forfeiture statute (Rev. St. § 3450), a specific intent to defraud is essential. The burden to establish such intent by competent evidence rests upon the United States. United States v. One Ford Coupé Automobile, 272 U. S. 321, 47 S. Ct. 154, 71 L. Ed. 279, 47 A. L. R. 1025. Direct proof of specific intent to defraud, however, is not essential. Such intent may be and generally must be shown by circumstantial evidence and may be presumed or inferred from all the facts and circumstances as well as the conditions surrounding the transaction at the time it took place. It is axiomatic that the law presumes every man to intend the natural and obviously probable consequences of his own acts, and wrongful acts knowingly committed can neither be justified nor excused on the ground of innocent intent. Agnew v. United States, 165 U. S. 36, 17 S. Ct. 235, 41 L. Ed. 624.

The problem presented, therefore, is whether the necessary inference or presumption of intent to defraud the United States of the tax upon the liquor found in

the car arises from the facts disclosed by the stipulation.

In support of his contention that these facts are insufficient to give rise to the presumption of intent to defraud, the intervener cites and relies upon several cases in which the driver of the car, sought to be forfeited under the statutes, had a small quantity of narcotics concealed on his person. The cases referred to are: United States v. One Kissel Touring Automobile (D. C.) 289 F. 120, United States v. One Studebaker Automobile (D. C.) 298 F. 191, and Cadillac Automobile Motor No. 61–D–476 v. United States (C. C. A.) 7 F.(2d) 102. In each of these cases, forfeiture of the vehicle was denied on the ground that the proof was insufficient to warrant a presumption of intent to defraud the government of the tax. They appear, however, to be clearly distinguishable from the case now under consideration.

In the Cadillac Automobile Case from the Sixth Circuit, Judge Denison clearly pointed out the difference between the statutes regulating the taxation of narcotics and the taxation of distilled liquors, one of which differences is that the duty as well as the power and authority to pay the tax on narcotics or to procure and affix the stamp on the container thereof is limited to an importer, manufacturer, producer, or compounder thereof. The facts in these narcotic cases failed to show that the user of the car was among the classes upon whom the duty to pay the tax or affix the stamp was imposed.

The insufficiency of the facts to authorize the presumption of intent to defraud, in these narcotic cases, is made more evident by the fact that the amount of the unpaid tax on the narcotics possessed by the driver of the car was only nominal, in some of the cases being only one cent. Of course, under such state of facts, it would be absurd, as the court said, to presume that the intent to defraud the government of only one cent entered into the transaction in any way whatsoever. In none of these narcotic cases was the amount of the tax involved sufficient to be material in reflecting the intent of the transaction.

The other cases cited and relied upon by the intervening petitioner involve facts showing that the evasion of the tax was merely incidental to the possession or transportation of liquor in violation of the National Prohibition Laws and in which the intent to violate the National Prohibition Act was obviously the only purpose or motive in the use of the vehicle for the deposit or concealment of the liquor. The cases referred to are: United States v. One Dodge Coupé (D. C.) 34 F.(2d) 942, United States v. One Reo Speed Wagon (D. C.) 5 F.(2d) 372, and United States v. One Five-Ton Federal Truck (C. C. A.) 25 F.(2d) 788. These cases seem to turn entirely upon the point that, as the National Prohibition Act (27 USCA) was then in force, the only obvious purpose and apparent intent inferable from surreptitious possession and transportation of illicit liquor was the purpose and intention to violate the Prohibition Law.

Perhaps, in most cases which arose during the days of national prohibition, the motive for concealment of illicit liquor in order to evade the penalties of the Prohibition Law was sufficient to exclude any inference of an intent to defraud the government of the tax which obviously was nothing more than incidental to the main purposes involved in the transaction.

Such could not be the case, however, at the time of the transaction here involved, when the National Prohibition Act was not in effect.

Unlike the Cadillac Automobile Case, supra, in which Judge Denison said that to presume or infer an intention to defraud the government of the tax merely from the fact of the possession of unstamped narcotics upon which the tax due was only one cent would be a "reductio ad absurdum," we have in this case 36 gallons of whisky on which the production tax is $6.40 per gallon, a total of $230.40, which, to say the least, was sufficient to materially affect the profits derived from traffic in such liquor. Such facts, not otherwise explained, seem to point with precision to the fraudulent purpose and motive behind the transaction.

In view of the 1934 Liquor Taxing Act, requiring the immediate containers of distilled spirits to be stamped and providing for the procurement of such stamps by the possessor of such containers, it would seem clear that the fact that distilled spirits found in the car did not have the stamps affixed is sufficient to charge the owner with knowledge that the tax on said liquor had not been paid. All implications of any other intent heretofore arising from the National Prohibition Laws having been re-

moved by the repeal of those laws, and taking into consideration all the facts and circumstances disclosed by the stipulation, in the absence of any countervailing facts, it seems not only fair, but necessary, to infer from all these facts and circumstances that the owner of the car was using it as a vehicle for deposit and concealment of unstamped liquor with the intention to defraud the United States of the tax thereon.

The circumstances of this case appear to clearly justify forfeiture of the car under section 3450, Rev. St., and the innocence of the intervening petitioner does not save it. General Motors Acceptance Corporation v. United States (C. C. A. 6) 40 F.(2d) 599.

A decree will be drawn and entered to conform to the views herein expressed.

Indentures in question were to be performed in Massachusetts, and lessee was under no obligation either to perform contract in London or any other foreign

market or to import gold for purpose of selling it to United States mints and turning proceeds over to lessor.